585 S.E.2d 506

Tom ANDERSON, Appellant,

v.

THE AUGUSTA CHRONICLE, Morris Communications, Inc., Respondents.

No. 3597.

Court of Appeals of South Carolina.

Heard May 9, 2001.

Decided Feb. 3, 2003.

Certiorari Granted Oct. 3, 2003.

462

466

John W. Harte, of Aiken, for Appellant.

James M. Holly, of Aiken; and David Hudson, of Augusta, for Respondents.

SHULER, J.:

In this defamation action, Tom Anderson appeals a directed verdict in favor of *The Augusta Chronicle* and Morris Communications, Inc. (collectively *"The Chronicle"*). We reverse and remand for a new trial.

## FACTS/PROCEDURAL HISTORY

In 1996, Tom Anderson ran unsuccessfully for a seat in the South Carolina House of Representatives. During the campaign, two hurricanes hit the coast of North Carolina; Anderson, a claims adjuster specializing in natural disasters, traveled to North Carolina to process insurance claims. As a result, Anderson was out of the state for ten weeks of the election season.

The next year, following redistricting, Anderson prepared to run again in a special election for the same House seat. Chad Bray, a reporter for *The Chronicle*, phoned Anderson twice to discuss the previous campaign. On April 6, 1997, *The Chroni-*

*cle* published an article by Bray concerning the special election and stating in relevant part:

> The Democrats [sic] best hope—other than Mr. Clyburn—may be Tom Anderson. He's expected to seek a rematch against state Rep. Roland Smith, R–Langley, Mr. Brown said.
>
> Mr. Anderson took 32 percent of the vote in District 84 when he ran against Mr. Smith in 1996, even though he was out of the area with the National Guard during the final weeks of the election.

At some point thereafter, Anderson announced his candidacy and again spoke with Bray by phone. According to Anderson, the subject of his absence during the 1996 campaign did not come up during the call. On June 3, *The Chronicle* published another article by Bray about the special election. In pertinent part, the article stated:

> Mr. Anderson, a Bath property appraiser, said he felt cheated after being called away for National Guard duty in the last month before the 1996 general election. Mr. Smith eventually won with 67 percent of the vote to Mr. Anderson's 33 percent.

Anderson, who asserts he never told Bray he worked with the National Guard, did not contact *The Chronicle* following publication of either article to request a retraction or correction.

The following September, John Boyette, *The Chronicle*'s Aiken Bureau Chief, contacted Anderson and asked if he was planning to withdraw from the race since he had been "proven" a liar for stating he was working for the National Guard in 1996. Anderson told Boyette Bray must have misunderstood when he said he had worked for the National Flood Insurance Program (NFIP), an insurance adjuster program operated under the auspices of the Federal Emergency Management Agency (FEMA). *The Chronicle* published Boyette's article, headlined "GOP wants Anderson out of House race," on September 18. The subheading read: "Clearwater Democratic candidate is accused of lying about his National Guard service." This article stated in part:

> The South Carolina Republican Party called for Tom Anderson to drop out of the House District 84 race Wednes-

day, charging that the Clearwater Democrat lied about service in the National Guard.

The South Carolina National Guard has no record of Mr. Anderson's ever serving, said Trey Walker, state GOP executive director. In a faxed statement, Mr. Walker said Mr. Anderson "should immediately dishonorably discharge himself from the race."

*The Augusta Chronicle* reported in June that Mr. Anderson said he felt cheated after being called away for National Guard duty in the last month before the 1996 general election . . . .

Mr. Anderson, however, denied Wednesday that he ever told *The Chronicle* that he had served in the National Guard. Instead, he said, he spent more than two months in North Carolina doing damage appraisals for the National Flood Insurance Group after two hurricanes hit the coast.

Last fall, National Guard units were called on to assist victims of Hurricane Fran in eastern North Carolina.

. . . .

Mr. Anderson was drafted into the Army, served in the Korean War and, after a two-year stint in Europe, was discharged in 1956.

The same day, an article appeared in the *Aiken Standard* with the headline, "Democrat responds to 'misinformation.' " This article, by senior writer Carl Langley, recorded Anderson's denunciation of *The Chronicle*'s allegations and quoted him as saying: "I've never been in the National Guard, and would have been a fool to make such a statement." The article continued:

Anderson missed several weeks of the last campaign by working on insurance claims generated from Hurricane Fran in North Carolina.

"I was gone on two occasions during the 1996 campaign, and a lot of the insurance (claims) we worked on involved the National Flood Insurance Program," said Anderson.

He speculated that the reporter for an Augusta newspaper couldn't tell the difference between the national flood insurance program and the National Guard.

. . . .

Anderson said he told the reporter that during the last election he had to go to North Carolina in July and again in September and October to work on the insurance claims.

Other local papers also published articles concerning the controversy.

On September 26, Anderson received a telephone call from Pat Willis. Willis told Anderson she was working on an article for *The Chronicle* and requested proof that he was a government-approved insurance adjuster and that he had worked in North Carolina in 1996. Anderson subsequently faxed Willis several documents, including a letter on FEMA/NFIP stationery approving his application for NFIP certified adjuster status.

Despite this information, on October 1 *The Chronicle* published an editorial with the headline "Let the liar run." Written by Phil Kent, *The Chronicle*'s editorial page editor, the piece stated in full:

> Clearwater Democrat Tom Anderson, running in November's court-ordered special election for South Carolina's House District 84 seat, has been exposed as a liar.
>
> He told this newspaper he was called away to National Guard duty in the last weeks of the 1996 election, his first race against incumbent state Rep. Roland Smith, R–Langley. (Anderson lost by a decisive margin.)
>
> It turns out, however, the state Guard has no record of Anderson ever serving—either then or any other time.
>
> State GOP director Trey Walker, saying Anderson has dishonored himself and the National Guard, demands that the Democrat withdraw from the race. Walker's right about the dishonor, but what about the withdrawal?
>
> If Anderson is the best Democrats can come up with, they still have every right to run him. There's nothing in the election rules that says a political party can't nominate for public office a candidate who, in effect, lies on his resume.
>
> We are confident that an informed electorate won't vote into office a proven prevaricator. After all, he doesn't even have the long robes of one of Al Gore's Buddhist monks to hide behind!

The morning following publication, Anderson tried to reach Kent to demand a retraction or clarification. After several attempts, Anderson eventually spoke with a woman named Tara in *The Chronicle*'s editorial department.[1] Tara informed Anderson that Kent "wouldn't talk" to him, but stated that if Anderson faxed a rebuttal letter it would be printed. In the meantime, Republican Party officials mailed copies of the editorial to district voters.

*The Chronicle* subsequently printed a "Clarification" on October 29:

> Tom Anderson, Democratic candidate in this year's special election for the South Carolina House District 84 seat, said he was called away from the Aiken area just before the 1996 election for the post to work for the National Flood Insurance Program. Mr. Anderson also said he was misquoted in [the] June 2 story in The Augusta Chronicle.

The paper also published Anderson's response as a Letter to the Editor on November 2.

Anderson ultimately filed a complaint for libel, amended March 8, 1999, alleging *The Chronicle* published false statements in Kent's editorial dated October 1, 1997. At a trial held October 11, 1999, *The Chronicle* moved for a directed verdict at the close of Anderson's case. The trial court orally granted the motion on October 12, finding Anderson failed to show constitutional malice, and thereafter filed a form order judgment. This appeal followed.

## LAW/ANALYSIS

### Standard of Review

When deciding a motion for a directed verdict, the trial court "must view the evidence and all reasonable inferences in the light most favorable to the non-moving party." *Swinton Creek Nursery v. Edisto Farm Credit, ACA,* 334 S.C. 469, 476, 514 S.E.2d 126, 130 (1999); *see Bell v. Evening Post Pub. Co.,* 318 S.C. 558, 459 S.E.2d 315 (Ct.App.1995). If the evidence presented yields only one inference such that the trial court may decide the issue as a matter of law, the decision to grant the motion is proper. *See Swinton,* 334 S.C.

---

1. Tara Harbin is Phil Kent's assistant at *The Chronicle.*

at 476, 514 S.E.2d at 130. On the other hand, a directed verdict motion on liability for libel is properly denied where evidence exists justifying submitting the issue to the jury. *See Holtzscheiter v. Thomson Newspapers, Inc.,* 332 S.C. 502, 513, 506 S.E.2d 497, 503 (1998).

▇▇▇▇ Whether a plaintiff has presented evidence sufficient to constitute actual malice is, in the first instance, a question of law for the trial court. *See Elder v. Gaffney Ledger,* 341 S.C. 108, 533 S.E.2d 899 (2000); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("When determining if . . . actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.*"); *Bose Corp. v. Consumers Union,* 466 U.S. 485, 511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'"). Similarly, the appellate court is obliged to independently examine the entire record on appeal and decide, *de novo,* whether the evidence presented below is of sufficient quantity and character to sustain a finding of actual malice. *See Elder,* 341 S.C. at 113–114, 533 S.E.2d at 902; *Miller v. City of West Columbia,* 322 S.C. 224, 471 S.E.2d 683 (1996); *see also Bose,* 466 U.S. at 512, 104 S.Ct. 1949 ("Appellate judges . . . must exercise independent judgment and determine whether the [entire] record establishes actual malice with convincing clarity."). In all cases the court must ask "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson,* 477 U.S. at 255–56, 106 S.Ct. 2505.

### Discussion

▇▇▇▇ The tort of defamation exists to redress injury to the plaintiff's reputation arising from the defendant's publication of a false and defamatory statement. *See Holtzscheiter,* 332 S.C. at 508, 506 S.E.2d at 501; *Swinton,* 334 S.C. at 484, 514 S.E.2d at 133. Proof of the tort requires the plaintiff to show

the defendant was at fault in publishing a false and defamatory statement concerning him to a third party that either caused him special harm or was actionable irrespective of harm. *See Fleming v. Rose,* 350 S.C. 488, 567 S.E.2d 857 (2002) ; *Boone v. Sunbelt Newspapers, Inc.,* 347 S.C. 571, 556 S.E.2d 732 (Ct.App.2001).

Although defamation is substantively a matter of our state common law, the federal Constitution "may reshape the common-law landscape to conform to the First Amendment." *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Thus, when a public figure or official[2] claims defamation by speech of public concern, the Constitution requires him "to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law." *Id.; see Beckham v. Sun News,* 289 S.C. 28, 30, 344 S.E.2d 603, 604 (1986) ("[I]n libel actions brought by public officials and public figures the traditional burdens of proof are necessarily altered by the constitutional protections afforded the press."). Part of this "higher barrier" is the degree of fault by the publisher that the plaintiff must prove. *See Herbert v. Lando,* 441 U.S. 153, 171–72, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) ("[S]ome error is inevitable; and the difficulties of separating fact from fiction convinced the Court ... to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material."); *see also Fleming,* 350 S.C. 488, 567 S.E.2d 857; *Beckham,* 289 S.C. at 30, 344 S.E.2d at 604.

*New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny prescribe the requisite fault to be proved by a public figure. Under this standard, the plaintiff must show an allegedly libelous state-

---

2. Anderson concedes he is a public figure for defamation purposes. *See, e.g., Monitor Patriot Co. v. Roy,* 401 U.S. 265, 271, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971) ("[I]t might be preferable to categorize a candidate as a 'public figure,' if for no other reason than to avoid straining the common meaning of words. But the question is of no importance so far as the standard of liability ... is concerned .... That [*New York Times*] itself was intended to apply to candidates, in spite of the use of the more restricted 'public official' terminology, is readily apparent from that opinion's text and citations to case law.") (footnote omitted).

ment was published with "actual malice." *Id.* at 279–280, 84 S.Ct. 710; *see George v. Fabri,* 345 S.C. 440, 548 S.E.2d 868 (2001); *Elder,* 341 S.C. at 113, 533 S.E.2d at 901. Proof of actual malice requires the plaintiff to demonstrate, by clear and convincing evidence, that the publisher made the statements either knowingly or with reckless disregard for their truth or falsity. *George,* 345 S.C. at 456, 548 S.E.2d at 876; *Elder,* 341 S.C. at 114, 533 S.E.2d at 902. Clear and convincing evidence may be defined as " 'that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be established.' " *Peeler v. Spartan Radiocasting, Inc.,* 324 S.C. 261, 269 n. 4, 478 S.E.2d 282, 286 n. 4 (1996) (citation omitted). It is an intermediate measure of proof, i.e., " 'more than a mere preponderance but less than is required for proof beyond a reasonable doubt; it does not mean clear and unequivocal.' " *Id.*

Actual malice is "a *subjective* standard which tests the defendant's good faith belief in the truth of [its] statements." *George,* 345 S.C. at 456, 548 S.E.2d at 876; *see Peeler,* 324 S.C. at 266, 478 S.E.2d at 284. Hence, absent proof of a knowing falsehood, the plaintiff must establish a defendant " 'in fact entertained serious doubts as to the truth of his publication' " or possessed a " 'high degree of awareness' " of probable falsity. *George,* 345 S.C. at 456, 548 S.E.2d at 876 (citations omitted); *see Holtzscheiter,* 332 S.C. at 512–13, 506 S.E.2d at 503 (proving constitutional actual malice requires a showing that the publisher either "realized the statement was false" or "had serious reservations about its truth"). Recklessness presupposes "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Peeler,* 324 S.C. at 266, 478 S.E.2d at 284.

Without question, " 'public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule.' " *George,* 345 S.C. at 454, 548 S.E.2d at 875 (quoting *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)); *see Monitor Patriot Co. v. Roy,* 401 U.S. 265, 271–72, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971) ("[If] the First Amendment was 'fashioned to assure the unfettered interchange of ideas for

the bringing about of political and social changes desired by the people,' then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.") (internal citation omitted). Indeed, the actual malice standard "is premised on our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *George,* 345 S.C. at 456–57, 548 S.E.2d at 876 (quoting *New York Times,* 376 U.S. at 270, 84 S.Ct. 710).

▮▮▮▮▮ The First Amendment, however, does not afford defamatory political speech absolute immunity. *See id.* at 455, 548 S.E.2d at 876; *Stevens v. Sun Publ'g Co.,* 270 S.C. 65, 71, 240 S.E.2d 812, 815 (1978) ("An individual's status as a public figure does not immunize a publisher from liability when it prints defamatory articles with malice."); *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("We have not gone so far . . . as to accord the press absolute immunity in its coverage of public figures or elections."). As the Supreme Court has stated:

> That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas . . . ." Hence the knowingly false statement and the false statement made with reckless disregard of the truth[ ] do not enjoy constitutional protection.

*Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (citation omitted); *see Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 150, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) ("[T]hat dissemination of information and opinion on questions of public concern is ordinarily a legitimate, protected and indeed cherished activity does not mean . . . that one may in

all respects carry on that activity exempt from sanctions designed to safeguard the legitimate interests of others.").

The sole basis of the trial court's decision to direct a verdict in *The Chronicle*'s favor, and the only question before this Court, is whether Anderson presented sufficient evidence to create a jury question on the constitutional malice element of defamation. We therefore assume for purposes of this opinion that *The Chronicle* published "Let the liar run" and that it contained false and defamatory statements. *See George*, 345 S.C. at 456 n. 7, 548 S.E.2d at 876 n. 7 ("Because summary judgment was granted solely on the issue of actual malice, we assume *arguendo* that the statements were false and defamatory."). Moreover, since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict," the evidence presented by Anderson "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) ("[W]e must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence.").

As an initial matter, it is important to recognize the presumptively false and defamatory statements contained in "Let the liar run" may constitute libel in two separate ways. First, the statement that Anderson "told this newspaper he was called away to National Guard duty in the last weeks of the 1996 election" could cause injury by attributing to Anderson a statement of fact he did not make. *See Masson*, 501 U.S. at 511, 111 S.Ct. 2419 ("A fabricated quotation may injure reputation ... [and] giv[e] rise to a conceivable claim of defamation ... because it attributes an untrue factual assertion to the speaker."); *White v. Wilkerson*, 328 S.C. 179, 184, 493 S.E.2d 345, 347 (1997) (holding a statement is defamatory "if the words used ... convey to the minds of those to whom they are addressed ... the impression that the plaintiff has done wrong" when considered in the context of the entire publication) (internal citation omitted). Such a statement is defamatory *per quod*, because its defamatory meaning is

derived from facts extrinsic to the statement itself, in this case Anderson's denial that he ever said what the editorial claims. *See Holtzscheiter,* 332 S.C. at 509, 506 S.E.2d at 501 ("If the defamatory meaning is not clear unless the hearer knows facts or circumstances not contained in the statement itself, then the statement is defamatory *per quod.*").

Second, the statements that Anderson "has been exposed as a liar," is a "proven prevaricator," and effectively "lies on his resume" are actionable in their own right as being defamatory *per se. See id.* at 508–09, 506 S.E.2d at 501 ("The defamatory meaning of a message or statement may be obvious on the face of the statement, in which case the statement is defamatory *per se.*"). Thus, we must look to each potential libel and determine if Anderson presented sufficient evidence to permit us to conclude a reasonable jury could have found *The Chronicle* acted with actual malice in publishing the statements. Viewed in the light most favorable to Anderson, the evidence reveals the following.

Anderson denies he ever told Chad Bray or anyone at *The Chronicle* that he left his district during the 1996 general election to serve in the National Guard, and we must presume his denial is correct. *See Masson,* 501 U.S. at 520–21, 111 S.Ct. 2419 ("[W]e must assume ... petitioner is correct in denying that he made the statements attributed to him .... [Author] contests petitioner's allegations, and only a trial on the merits will resolve the factual dispute."). Instead, Anderson asserts that in a telephone interview in the spring of 1997, he told Bray he had been out of the area working for various insurance companies. When Bray, who appeared unfamiliar with the property insurance industry, asked him to describe what a property company does and to name one, Anderson recounted several, including the National Flood Insurance Program. According to Anderson, Bray confused this reference to *National Flood* with the *National Guard.*

After two brief mentions of Anderson and the National Guard in articles written by Bray the previous April and June, on September 17, 1997, *The Chronicle's* John Boyette telephoned Anderson and inquired if he was planning to withdraw from the special election race because he had lied about being in the National Guard. Anderson contends he gave Boyette

"the facts" at this time, i.e., that he had been working for various insurance companies in North Carolina, not the National Guard, and we assume Anderson's version of this telephone conversation is accurate. *See id.*

Despite Anderson's express disavowal, Boyette authored the September 18 article in which he repeated the National Guard statement along with Anderson's denial and explanation for his absence, and *The Chronicle,* now obviously aware of the denial, published Kent's editorial on October 1.[3] Although *The Chronicle* subsequently printed a "Clarification" and Anderson's Letter to the Editor, the paper never retracted its assertion that Anderson had claimed to be in the National Guard or its conclusion that he was a liar.

The Supreme Court has held that the "deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of [actual malice], unless the alteration results in a material change in the meaning conveyed by the statement." *Masson,* 501 U.S. at 517, 111 S.Ct. 2419 (internal citations omitted). Anderson, however, does not contend Bray intentionally altered his statement concerning National Flood. Instead, Anderson argues he carried his burden on actual malice by showing *The Chronicle* knew of the alleged inaccuracy and chose to ignore it.

In conducting our independent examination of the record, we concentrate on evidence of *The Chronicle*'s "conduct and state of mind." *Herbert,* 441 U.S. at 160, 99 S.Ct. 1635; *see Butts,* 388 U.S. at 152–53, 87 S.Ct. 1975 ("[*New York Times*] makes clear . . . that neither the interests of the publisher nor those of society necessarily preclude a damage award based on improper conduct which creates a false publication. It is the

---

3. Although *The Chronicle* concedes Phil Kent authored the editorial, it argues Anderson "presented no evidence on who wrote the editorial or who . . . had responsibility for publication of the editorial." This contention is belied not only by *The Chronicle*'s admission, but also by Anderson's trial testimony and a letter from Kent to Anderson's son Mark. On re-direct, in response to a question concerning who was "responsible for the creation of the [editorial]," Anderson replied, "Phil Kent and *The Augusta Chronicle.*" In addition, the letter, on *Chronicle* stationery listing "Philip Kent" as the "Editorial Page Editor" and admitted into evidence without objection, includes his statement that "[m]y responsibility is solely for the opinion pages, including letters to the editor."

conduct element, therefore, on which we must principally focus
. . . .").

The law of libel recognizes the subjective nature of
a media defendant's intent may be very difficult to prove.
Because a plaintiff "will rarely be successful in proving aware-
ness of falsehood from the mouth of the defendant himself,"
any direct or indirect evidence relevant to the defendant's
state of mind is admissible to demonstrate actual malice.
*Herbert,* 441 U.S. at 170, 99 S.Ct. 1635; *see Harte–Hanks,* 491
U.S. at 668, 109 S.Ct. 2678 ("[A] plaintiff is entitled to prove
the defendant's state of mind through circumstantial evidence
. . . .") (internal citations omitted); *Zerangue v. TSP Newspa-
pers, Inc.,* 814 F.2d 1066, 1070 (1987) ("Although the defen-
dant's state of mind is a subjective fact, it can be shown by
indirect or circumstantial evidence."). Moreover, since "[t]he
finder of fact must determine whether the publication was
indeed made in good faith," a plaintiff's presentation of compe-
tent circumstantial evidence of bad faith may establish actual
malice despite a defendant's claim that a publication was made
"with a belief that the statements were true." *St. Amant v.
Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262
(1968); *see McFarlane v. Sheridan Square Press, Inc.,* 91
F.3d 1501, 1510 (recognizing a plaintiff is "entitled to an
aggregate consideration" of evidence of actual malice); *Tavou-
lareas v. Piro,* 260 U.S.App.D.C. 39, 817 F.2d 762, 789
(D.C.Cir.1987) ("[A] plaintiff may prove the defendant's sub-
jective state of mind through the cumulation of circumstantial
evidence."); *Zerangue,* 814 F.2d at 1070 (stating sufficient
indirect evidence of actual malice can negate a defendant's
assertion that he acted in good faith).

"Reckless disregard" is a term of art that "cannot be fully
encompassed in one infallible definition." *St. Amant,* 390 U.S.
at 730, 88 S.Ct. 1323. To the contrary, the recklessness
standard is formed as case law evolves. *Id.; see Harte–
Hanks,* 491 U.S. at 686, 109 S.Ct. 2678 ("[O]nly through the
course of case-by-case adjudication can we give content to
these otherwise elusive constitutional standards."). Hence,
beginning with *New York Times,* where the plaintiff's case
was unsuccessful because "the record failed to show that the
publisher was aware of the likelihood that he was circulating
false information," *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323,

the Supreme Court has continually refined the standard's parameters to guide the state and lower federal courts in making independent determinations on actual malice.

Although a publisher's "[f]ailure to investigate does not in itself establish bad faith," *id.* at 733, 88 S.Ct. 1323, the Court has articulated several instances where recklessness might be shown. One of these is "where there are obvious reasons to doubt the veracity of [an] informant *or the accuracy of his reports.*" *St. Amant,* 390 U.S. at 732–33, 88 S.Ct. 1323 (emphasis added); *see Herbert,* 441 U.S. at 156, 99 S.Ct. 1635 (stating a court may find " 'subjective awareness of probable falsity' " if " 'there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' ") (citations omitted); *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678 (same).

While we recognize the opinions in *St. Amant; Herbert,* and *Harte–Hanks* were referring to a publisher's outside source, we see no legitimate reason why the analysis would not apply with equal force to a newspaper's own reporter, particularly when the evidence points to a mistake or misunderstanding between the reporter and his interview subject. In fact, in considering the *Masson* case on remand from the Supreme Court, the Ninth Circuit Court of Appeals so held. *See Masson v. New Yorker Magazine, Inc.,* 960 F.2d 896, 900 (9th Cir.1992) (stating where direct proof of a publisher's actual state of mind is missing, the jury may nevertheless infer awareness of falsity if it finds circumstances which "gave the publisher 'obvious reasons to doubt' " the "accuracy of facts and quotations" in an author's article and the publisher "failed to take reasonable steps to dispel those doubts"); *see also Speer v. Ottaway Newspapers, Inc.,* 828 F.2d 475, 477 (8th Cir.1987) (treating reporter who supplied false information but had no input into defamatory editorial as "outside source" for purposes of actual malice determination based on the newspaper's alleged recklessness). Similarly, our supreme court has declared that "actual malice may be present where the defendant fails to investigate *and there are obvious reasons to doubt the veracity* of the *statement* or informant." *George,* 345 S.C. at 459, 548 S.E.2d at 878 (additional emphasis added); *see Zerangue,* 814 F.2d at 1070 ("[C]ourts have upheld findings of actual malice when a defendant failed to investigate a

story weakened by ... apparently reliable contrary information.").[4] In our view, the facts of this case amply demonstrate "obvious reasons to doubt" the truth of the National Guard statement reported by Bray.

To begin, *The Chronicle* unquestionably knew Anderson disputed Bray's version of their conversation,[5] as it had published Boyette's article containing an express denial less than two weeks before "Let the liar run." Indeed, *The Chronicle*'s primary argument before the trial court and now as respondent is that Anderson cannot show actual malice because Kent, as editor, simply chose to believe Bray rather than Anderson. But unlike *Speer, supra,* this was not a case of a publisher's failure to guess accurately among conflicting accounts of a perceived event. In *Speer,* the court found no clear and convincing evidence of actual malice when a newspaper failed to investigate a reporter's information that had been disputed by others because the editorial staff "already knew both versions" of the incident and "at least two eyewitnesses had corroborated [the reporter's] version." *Speer,* 828 F.2d at 478. Here, however, Kent never spoke with Anderson to obtain his side of the story.

Furthermore, our supreme court's decision in *Peeler, supra,* is similarly unavailing. The *Peeler* court ruled that subjective awareness of probable falsity is not shown with convincing clarity by evidence indicating a publisher and plaintiff "disagreed with respect to their perceptions of events which they

---

**4.** We agree with the court in *Masson,* which explained that *Harte–Hanks* and other Supreme Court precedent stand for the proposition "that a publisher who does not already have 'obvious reasons to doubt' the accuracy of a story is not required to initiate an investigation that might plant such doubt. Once doubt exists, however, the publisher must act reasonably in dispelling it. Thus, where the publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to conduct the investigation in the first place." *Masson,* 960 F.2d at 901.

**5.** Although the record before us indicates Bray "stands by his story on the National Guard issue," the determination of what Anderson actually said is uniquely a question for the trier of fact. *See Masson,* 501 U.S. at 521, 111 S.Ct. 2419 (stating that, although the article's author contested the plaintiff's allegations that he was misquoted, "only a trial on the merits will resolve the factual dispute").

both observed." *Peeler,* 324 S.C. at 266–67, 478 S.E.2d at 285. As *The Chronicle* recognizes, though neither *Peeler* nor the Wyoming opinion quoted therein so states, this language effectively recites the "rational interpretation" doctrine outlined by the Supreme Court in *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), and *Bose, supra.* These cases held that where a publisher chooses "one of a number of possible rational interpretations" of an event "bristl[ing] with ambiguities," the choice, even if it reflects a misconception, is protected under the First Amendment. *Pape,* 401 U.S. at 290, 91 S.Ct. 633; *Bose,* 466 U.S. at 512, 104 S.Ct. 1949. *The Chronicle* contends that because Kent "was presented in the preceding articles with a rational account of what [Anderson] said to Bray and why he said what he did," Anderson cannot establish actual malice.

 *Masson,* however, explicitly rejected "rational interpretation" protection for defamatory statements in the context of alleged misquotations. *See Masson,* 501 U.S. at 518, 111 S.Ct. 2419. There, the Court unequivocally stated that "[t]he protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon *ambiguous* sources." *Id.* at 519, 111 S.Ct. 2419 (emphasis added). As the Court noted:

> Were we to assess quotations under a rational interpretation standard, we would give journalists the freedom to place statements in their subjects' mouths without fear of liability.... Not only public figures but the press doubtless would suffer under such a rule. Newsworthy figures might become more wary of journalists, knowing that any comment could be transmuted and attributed to the subject, so long as some bounds of rational interpretation were not exceeded. We would ill serve the values of the First Amendment if we were to grant near absolute, constitutional protection for such a practice.

*Id.* at 520, 111 S.Ct. 2419. As in *Masson,* the significance of *The Chronicle*'s unqualified statement that Anderson "told this newspaper" he was in the National Guard is to inform the reader he is reading Anderson's statement, not *The Chronicle*'s "rational interpretation of what [Anderson] said or thought." *Id.* at 519–20, 111 S.Ct. 2419. We therefore reject

*The Chronicle*'s contention that any part of "Let the liar run" is protected under the doctrine of "rational interpretation."[6]

Turning to the evidence at hand, the record reflects that in addition to Anderson's emphatic denial that he ever claimed to be in the National Guard, *The Chronicle* knew Anderson thought Bray had confused National Flood with National Guard. Anderson testified he told John Boyette he had been in North Carolina working for various insurance companies. Boyette's September 18 article confirms this, referencing not only Anderson's denial but also his assertion that he actually said he spent two months working in North Carolina for National Flood. According to Anderson's testimony, he contacted *The Chronicle* to dispute Boyette's article and was under the impression Boyette had the situation "covered" and "put to rest."

However, on September 26 Anderson received a call from *The Chronicle*'s Pat Willis, who said she was working on an article about candidates in the upcoming special election. Anderson testified Willis specifically asked him for proof that he was a federally-approved insurance adjuster and that he had worked in North Carolina the year before. In response, Anderson faxed Willis seven pages of information along with a cover sheet which read:

To: Pat Willis

Fr: Tom Anderson

National Flood info to follow — Proves I am certified to handle their claims — Ask John to have retraction run prior to 11–4–97.

NFIP Info — 3 pages

Resume — 2 pages

---

6. We further note this case is factually distinguishable from both *Peeler* and its source for the rationality principle, *McMurry v. Howard Publ'ns, Inc.*, 612 P.2d 14 (Wyo.1980). Not only did *Peeler* involve a situation in which a discrepancy emerged between what several listeners, including the reporter, thought they heard a third party say, there was absolutely *no* evidence suggesting the reporter or publisher had reason to doubt the truth of the statements at issue *before* publication. *McMurry*, on the other hand, is clearly a case where several parties heard the plaintiff *say* the same thing, but interpreted the *meaning* of what was said differently; the statement, therefore, properly was protected under a rational interpretation principle.

[E]lection info — *2 pages*

8 pages

The transmission included a letter from the supervisor of the NFIP's claims field operations, dated September 11, 1996 and addressed to Anderson on National Flood Insurance Program stationery, that stated in part: "We are pleased to advise you that your application for NFIP Adjuster Certification has been approved." [7] As indicated on the cover sheet, Anderson also faxed a resume he prepared and used during his campaign for House Seat 84.[8]

Replete with references to his work in flood insurance and related matters, the resume noted Anderson had been 1) commended for supervising flood restoration projects in four states; 2) responsible for "approximately 200 contractors, workmen and damage assessors in efforts to house 4500 flood inundated families"; 3) a program chief in Johnstown, Pennsylvania following a destructive flood; 4) a contract coordinator in Los Angeles after mudslides in 1979; 5) a work supervisor following flooding in Winslow, Arizona; and 6) an appraiser of "property damage for various insurance companies and government agencies following hurricanes Andrew, Hugo, Alicia, Freddie, Camille, [and] Betsy. . . ." Thus, Anderson not only directly contradicted Bray's initial reports in *The Chronicle*, he furnished the newspaper, *at its request*, with documentary evidence to support his denial.

Although Anderson's age was not listed on the resume, it did refer to his military service in the Korean War. Boyette's article also stated Anderson "was drafted into the Army, served in the Korean War and, after a two-year stint in Europe, was discharged in 1956." Because military records are public and easily verifiable, we believe a jury could have concluded *The Chronicle*, in full possession of this information,

---

7. Anderson testified the letter, which specifically authorized him to "handle residential, commercial and condominium losses," reflected a renewal of his status as a certified adjuster for National Flood. According to Anderson, the agency had certified him "five or six times" before 1996.

8. Although *The Chronicle* now asserts the documents faxed to Willis were "confusing," the paper made no attempt to contact Anderson for an explanation or to request additional information.

should have realized Anderson's purported statement was highly improbable, particularly in light of his advanced age and the fact such a claim was obviously inconsistent with his resume, which listed military service but made no mention of the National Guard.[9]

The above-stated facts about Anderson, known to *The Chronicle* before publication of "Let the liar run," support our conclusion that a reasonable jury could have found the newspaper had "obvious reasons to doubt" Bray's recollection of his conversation with Anderson. Without question, the phone call from Pat Willis clearly evidences some doubt at *The Chronicle* as to whether Bray accurately attributed the National Guard remark to him. Not only did Anderson deny the remark, he offered a logical explanation for Bray's confusion supported by documentary evidence. In light of these facts, we believe *The Chronicle*'s failure to undertake a reasonable investigation into the matter creates a jury question as to whether it published the editorial with actual malice.[10] *See St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323 ("Publishing with [obvious] doubts shows reckless disregard for truth or falsity and demonstrates actual malice."); *Butts*, 388 U.S. at 169–70, 87 S.Ct. 1975 (Warren, C.J., concurring in result) ("Suffice it to say that little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account to be published was absolutely untrue. Instead, the Saturday Evening Post proceeded on its reckless course with full knowledge of the harm that would likely result from publication of the article."); *Masson*, 960 F.2d at 900–01 (holding evidence which could sustain a jury verdict as to actual malice included knowledge on the

---

9. *The Chronicle's* assertion that "evidence concerning whether or not [Anderson] could have served in the National Guard does not establish what [he] said to reporter Bray during their two telephone interviews" misses the point. The issue involved in the actual malice inquiry is not what Anderson said, but whether *The Chronicle* had reason to doubt the accuracy of Bray's report or its own conclusion that Anderson was a liar based on that report.

10. As noted in *Masson* on remand, "[i]t is not ... the failure to act reasonably in itself that establishes malice; that failure is only a link in the chain of inferences that could (but need not) lead a jury to conclude that the publisher failed to conduct an investigation because it was already pretty much aware of the falsity." *Masson*, 960 F.2d at 900.

part of the publisher that the plaintiff disputed the accuracy of a quotation attributed to him along with the fact that the publisher did not dismiss the plaintiff's charge of inaccuracy out of hand).

Furthermore, Anderson's trial evidence circumstantially supports an inference of actual malice in this case. Without objection, Anderson entered into evidence an editorial by Senior Writer Carl Langley that appeared in the *Aiken Standard* on September 21, 1997. Langley wrote:

> A year ago, and shortly before the November elections, Anderson, a semi-retired insurance claims adjuster, was asked by a group of independent insurance companies to help process claims from hurricane damage in North Carolina.
>
> A large number of the claims were made under the National Flood Insurance Program, *which Anderson referred to in his conversations with me and which he told me he gave to another reporter.*
>
> (*He not only furnished that information last year, but again this past June* after I asked why he did not campaign before the 1996 election.)

Anderson supported this affirmation by introducing a brief clip from the *Aiken Standard* dated September 27, 1996 and headlined "Candidate leaves area to help Fran victims." In relevant part, the article stated:

> Aiken County House candidate Tom Anderson has had to break off his campaign for House District 84 to help process insurance claims resulting from Hurricane Fran's destruction in North Carolina.
>
> Anderson, the Democratic candidate in House District 84, was called out of town and is now working on claims in North Carolina and Virginia, a Democratic Party official said.

A jury could reasonably infer from this evidence that Anderson had in fact said National Flood, or that even a cursory investigation of his denial would have revealed the likelihood of a misunderstanding.

Other documentary evidence includes Anderson's cancelled check, dated October 10, 1996 and payable to an inn in Jacksonville, N.C., that bore the notation "lodging—Fran 9/9

to 10/10/[9]6." Certainly, if *The Chronicle* had inquired further, it would have discovered Anderson could in fact prove he was working on hurricane-related claims in North Carolina just before the November election. Moreover, a reasonable jury could infer that claims of inaccuracy from a candidate running for public office would be taken seriously by a newspaper purporting to publish the truth. *The Chronicle*'s failure to do so provides a legitimate basis for a jury to conclude "Let the liar run" was published with actual malice because it evinces an intent to avoid the truth. *See Harte–Hanks*, 491 U.S. at 692–93, 109 S.Ct. 2678 ("[I]t is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [its editorial].... Although failure to investigate will not alone support a finding of actual malice ... the purposeful avoidance of the truth is in a different category.... [E]vidence of an intent to avoid the truth was not only sufficient to convince the plurality [in *Butts*] that there had been an extreme departure from professional publishing standards, [ ] it was also sufficient to satisfy the more demanding [*New York Times*] standard ...."); *Masson*, 960 F.2d at 901 (stating that even in the absence of proof of a conscious decision to alter a quotation on the publisher's part, a jury could still conclude the publisher had obvious reasons to doubt the quote's accuracy but, "in an effort to purposefully avoid the truth, failed to conduct a reasonable investigation" of the plaintiff's claims of inaccuracy) (citations omitted); *Elder*, 341 S.C. at 114, 533 S.E.2d at 902 (finding actual malice may be established when there is at least some evidence that "the defendant purposefully avoided the truth").

 Further support is found in the fact that the editorial was not "hot news." The phone conversation in which Bray claimed Anderson stated he was in the National Guard occurred at some point prior to Bray's first article, which appeared in *The Chronicle* on April 6, 1997. Kent did not publish "Let the liar run" until October 1, nearly six months later. Undoubtedly, if *The Chronicle* suspected Anderson lied to Bray, it had ample opportunity to investigate the matter before publishing the editorial; evidence of intentional avoidance can itself lead to a reasonable conclusion of recklessness. *See Stevens*, 270 S.C. at 72, 240 S.E.2d at 815

(finding reckless disregard where the defamatory matter was not "hot news" and the newspaper failed to verify it despite warnings concerning its falsity). Indeed, a jury logically could infer some measure of reckless conduct from the fact *The Chronicle* chose to wait and publish the opinions of Kent, whose political bias was evident in the editorial's tone, until just a few weeks before the special election.[11]

Finally, *The Chronicle*'s publication of a "Clarification" on October 29, 1997 is susceptible of an inference bolstering a finding of reckless disregard. The clarification was published nearly a month after the editorial defaming Anderson. Although it also noted Anderson's assertion he had been misquoted in the June 2 article by Bray, this was six weeks after Anderson told Boyette about the mistake. Inferentially, a jury could find *The Chronicle*'s lackluster "clarification" was

---

11. We recognize a defamatory item published in an editorial/opinion column may in some circumstances militate against a finding of actual malice. *See Elder*, 341 S.C. at 118 n. 9, 533 S.E.2d at 904 n. 9 ("The 'form and content of [a] story are relevant ... to the question of actual malice.'") (quoting *Harte–Hanks*, 491 U.S. at 695, 109 S.Ct. 2678). However, "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals [can recover if they] show that such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). As noted in *Milkovich*:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Id.* at 18–19, 110 S.Ct. 2695. Thus, the mere fact that an item appears on the editorial page and is couched in terms of an "opinion" does not relieve the speaker or publisher from liability. *See id.; see also Goodwin v. Kennedy*, 347 S.C. 30, 41, 552 S.E.2d 319, 325 (Ct.App.2001) (applying *Milkovich* to uphold the trial court's denial of a requested jury instruction that "appear[ed] to exempt all opinion as non-defamatory comment without qualification"). To the contrary, the same constitutional analysis applies to statements of opinion that imply an assertion of fact, unless, of course, the statement is not capable of being proved either true or false.

merely an attempt to avoid liability for "Let the liar run" rather than a sincere effort at rectifying the harm done to Anderson's reputation. *See, e.g., Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 46, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) ("Denials, retractions, and corrections are not 'hot' news, and rarely receive the prominence of the original story."). The reasonableness of such a conclusion is buttressed by the fact the "Clarification" did not clarify anything; it failed to put the issue in context by referencing either the editorial or previous articles by Boyette and Bray. More important, it was neither a correction nor a retraction of the allegedly false statements. *See Zerangue,* 814 F.2d at 1071 ("Refusal to retract an exposed error tends to support a finding of actual malice.").

Taken as true, we think Anderson's testimony, combined with the irrefutable documentary evidence in the record, is sufficient to permit a jury to decide whether *The Chronicle* published the statements in "Let the liar run" with actual malice. *See Masson,* 501 U.S. at 510, 111 S.Ct. 2419 (stating a plaintiff's sworn denial of the defamatory statements attributed to him, combined with such additional evidence as the resemblance of the statements to what was actually said, the absence of a tight deadline affording the author a practical ability to investigate, and the opportunity to make corrections along the way, created a jury question as to whether the defendant published the statements with actual malice). At the time of publication, *The Chronicle* had no more reason to believe Bray and his report of Anderson's statement than Anderson's denial. As the lower court observed in *Masson,* in the absence of independent evidence, it is not unreasonable to expect a publisher to investigate an alleged alteration in a quotation by confronting the author and asking him to verify the statement's accuracy by producing notes or other supporting materials. *Masson,* 960 F.2d at 902.

Moreover, even if the statement "[Anderson] told this newspaper he was called away to National Guard duty" were found to be true, a reasonable jury could infer it was at most a "slip of the tongue" and not an intentional attempt to mislead. Thus, if the editorial correctly attributed the National Guard statement to Anderson but the jury determined he was not a liar, Anderson would still be entitled to recover for defamation. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S.

1083, 1097, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) ("[A] defamatory assessment of facts can be actionable even if the facts underlying the assessment are accurately presented.").

 The Supreme Court has stated repeatedly that "there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *see Herbert,* 441 U.S. at 171, 99 S.Ct. 1635 ("Spreading false information in and of itself carries no First Amendment credentials."). The Court also has noted that "quotations may be a devastating instrument for conveying false meaning." *Masson,* 501 U.S. at 517, 111 S.Ct. 2419. Because "a person's reputation is invaluable," *Miller,* 322 S.C. at 231, 471 S.E.2d at 687, "[t]hose who publish defamatory falsehoods with the requisite culpability ... are subject to liability, the aim being not only to compensate for injury but also to deter publication of unprotected material threatening injury to individual reputation." *Herbert,* 441 U.S. at 172, 99 S.Ct. 1635.

First [A]mendment cases are unique because our society places a high value on free discussion of public issues, and those who engage in that discussion are protected even when they make careless errors. However, reputation is also a value, and the courts attempt, where possible, to protect both freedom of speech and reputation. Balancing these two interests mandates that a publisher have clear [F]irst [A]mendment protection from liability for the *first* nonmalicious publication of an erroneous story. However, once the publisher knows that the story is erroneous ... the argument for weighting the scales on the side of [F]irst [A]mendment interests becomes less compelling.... At some point, the effort required of the publisher is so slight, and the helplessness of the victim so great, that the balance of the scales tips.

*Zerangue,* 814 F.2d at 1072 (internal citations omitted). Accordingly, although the actual malice standard "offers substantial protection to the critic of a public figure," it "should not be taken as a signal that 'All is fair' in politics." *George,* 345 S.C. at 462, 548 S.E.2d at 879–80.

The evidence in the record before us supports an inference *The Chronicle* went beyond the "sloppy journalism" found in

*Peeler* when it published "Let the liar run." We are satisfied this evidence, viewed in the light most favorable to Anderson, is of a convincing clarity sufficient to justify sending the question of actual malice to a jury. *See Anderson,* 477 U.S. at 257, 106 S.Ct. 2505 (declaring it the duty of the reviewing court to determine "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity"). The trial court, therefore, erred in directing a verdict on this ground.

**REVERSED and REMANDED.**

GOOLSBY, J., concurs.

HEARN, C.J., dissents in a separate opinion.

HEARN, C.J., dissenting:

Because I believe Anderson failed to present clear and convincing evidence that *The Chronicle* acted with actual malice, I respectfully dissent.

In defamation actions involving "public figures," the plaintiff bears the burden of proving the statement was made with actual malice—that is, with either knowledge the statement is false or reckless disregard for its truth. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); *Elder v. Gaffney Ledger,* 341 S.C. 108, 113, 533 S.E.2d 899, 901 (2000). Whether the evidence is sufficient to support a finding of actual malice is a question of law. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989). An appellate court must independently review the record to determine whether the evidence presented at trial is sufficient to support a finding of actual malice. *Elder,* 341 S.C. at 113–14, 533 S.E.2d at 902; *Miller v. City of West Columbia,* 322 S.C. 224, 228, 471 S.E.2d 683, 685 (1996). In all cases, the court must determine whether the evidence in the record could support a reasonable jury finding that plaintiff proved actual malice **by clear and convincing evidence.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (emphasis added).

Actual malice is the subjective standard testing the publisher's good faith belief in the truth of his or her statements.

*Peeler v. Spartan Radiocasting, Inc.,* 324 S.C. 261, 478 S.E.2d 282 (1996). Therefore, in order to prevail, Anderson must present clear and convincing evidence establishing *The Chronicle* had no good faith belief in the truth of its statements, and thus acted with reckless disregard for the truth when publishing "Let the Liar Run." "A 'reckless disregard' for the truth, however, requires more than a departure from reasonably prudent conduct." *Elder,* 341 S.C. at 114, 533 S.E.2d at 902. Instead, the plaintiff must present "sufficient evidence that the defendant **in fact entertained serious doubts as to the truth** of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (emphasis in original). "There must be evidence the defendant had a **'high degree of awareness of ... probable falsity.'** " *Elder,* 341 S.C. at 114, 533 S.E.2d at 902 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)) (emphasis in original). To prove such, Anderson must present evidence, from a subjective standpoint, which demonstrates what *The Chronicle* knew with regard to the alleged falsity of its statements. It is insufficient to show the defendant made an editorial choice or merely failed to investigate; there must be evidence at least that the defendant **purposefully avoided the truth.** *Id.* (citations omitted) (emphasis added).

I believe there is insufficient evidence in the record to establish *The Chronicle* acted with actual malice in publishing the editorial written by Kent. After Bray first interviewed Anderson, *The Chronicle* published an article stating Anderson was in the National Guard. When Anderson announced he would again run as a candidate, he spoke with Bray once more, and a second article was published in which *The Chronicle* referenced Anderson's alleged service in the National Guard. Anderson never requested a retraction or correction of either publication. It was not until Boyette contacted Anderson about the GOP's request for Anderson to withdraw from the race that Anderson denied having made such statements to Bray. Furthermore, *The Chronicle* reported Anderson's version of why he was in North Carolina and that Anderson denied telling *The Chronicle* he served in the National Guard in its article discussing the GOP's sentiments.

Prior to the publication of "Let the Liar Run," *The Chronicle's* Pat Willis contacted Anderson and informed him that she was working on an article and requested proof that he was a government-approved insurance adjuster and that he had worked in North Carolina in 1996. A reasonable jury might view this investigation as subjective evidence that *The Chronicle* did not believe Anderson was so licensed and that he had in fact allowed Bray to believe he was serving in the National Guard. Though Anderson was able to prove his status as a certified insurance adjuster, this fact does not establish that he accurately communicated to Bray his reason for being in North Carolina and that *The Chronicle* purposefully avoided the truth when publishing "Let the Liar Run." Moreover, from the subjective point of view of *The Chronicle,* its position that Anderson had stated he was in the National Guard is strengthened by Anderson's failure to object to *The Chronicle's* two prior reports and Bray's continued belief in his version of the interview with Anderson.

The majority places emphasis on the fact that *The Chronicle* was aware that Anderson disputed Bray's assertion that Anderson stated he served in the National Guard. However, this evidence fails to demonstrate *The Chronicle* in fact knew the falsity of its editorial "Let the Liar Run." Rather, this fact demonstrates only that *The Chronicle* knew of Anderson's disagreement with Bray's version of the interview—a fact *The Chronicle* had published as well. Moreover, evidence that Anderson disputed Bray's version of their conversation says nothing about *The Chronicle's* knowledge as to the truth of the matter, especially considering that Bray stood behind his recollection of the interview.

The only evidence presented at trial was Anderson's own testimony about his conversations with reporters from *The Chronicle.* Because the test for actual malice is subjective as to the knowledge of the publisher, evidence of Anderson's personal recollection of the interviews fails to shed light on what *The Chronicle* believed in good faith about the truth of the statements it published. Anderson presented no evidence regarding the standards and practices of the newspaper industry nor did he present any evidence that *The Chronicle* in fact knew Anderson did not tell Bray he had served in the National Guard. Furthermore, Anderson's challenge to the publica-

tion came only after the Republican Party asked him to withdraw from the race. As a public figure, Anderson bore the burden of proof to establish actual malice by clear and convincing evidence. *Peeler*, 324 S.C. at 266, 478 S.E.2d at 284. Because I believe the evidence presented by Anderson falls far short of establishing *The Chronicle* published "Let the Liar Run" with a high degree of knowledge as to its probable falsity, I would affirm the trial court's directed verdict in favor of the publisher.