682 S.E.2d 877

**Jerry D. DUNCAN and Anna M. Duncan, Respondents,**

v.

**FORD MOTOR COMPANY, Appellant.**

No. 4607.

Court of Appeals of South Carolina.

Heard Nov. 5, 2008.

Decided Aug. 12, 2009.

Rehearing Denied Sept. 17, 2009.

124

Curtis L. Ott and Carmelo B. Sammataro, both of Columbia, for Appellant.

Karl S. Brehmer and L. Darby Plexico, III, both of Columbia, for Respondents.

HEARN, C.J.

Jerry and Anna Duncan initiated this lawsuit against Ford Motor Company after a fire, originating under the hood of their 2000 Ford Expedition, destroyed their home. The Duncans alleged Ford knowingly installed a defective speed control deactivation switch into the vehicle, which caused it to ignite. At the conclusion of trial, the jury awarded the Duncans $620,759.79 in actual damages, reduced to $589,721.80 in proportion to their comparative fault, and $3 million in punitive damages. Ford appeals. We affirm.

## FACTS

Ford manufactured the Duncans' Ford Expedition in December 1999. A short time later, the Duncans purchased the vehicle and drove it without major incident until March 1, 2005. On that day, Anna Duncan parked her vehicle in the carport next to her home and walked inside. A few minutes later, her husband, Jerry, walked outside and observed fire coming from underneath the hood of the Expedition. Upon seeing the fire, Jerry told his wife to call 911, tried to put the fire out with a fire extinguisher, and attempted to drive the car away from their home. When the fire extinguisher failed

and the car did not start, Jerry attempted to use the hayfork on the front of his tractor to remove the car from the premises. However, this effort was also unsuccessful. By this time, the fire had spread to the carport, and strong winds quickly pushed the flames from the carport to the Duncans' adjacent home. The Duncans fled to the end of the driveway and watched as the fire destroyed their home.

Prior to this incident, Ford recalled two lines of vehicles because of under-hood fires. First, in 1999, Ford recalled the panther platform line of vehicles, consisting of the Lincoln Town Car, the Ford Crown Victoria, and the Mercury Grand Marquis. Later, in 2005, Ford recalled the F–Series line of vehicles, including the Expedition. Ford attributed the under-hood fires in both lines of vehicles to the failure of the speed control deactivation switch (the switch). The switch, designed and manufactured by Texas Instruments, contained a hydraulic side and an electrical side separated by a thin layer of plastic called the kapton seal. The chief function of the kapton seal was to prevent brake fluid from entering the electrical side of the switch. In both the 1999 and 2005 recalls, Ford determined the fires were caused by the failure of the kapton seal to prevent fluid from entering the electrical side of the switch. Ford first installed the switch in panther platform vehicles in 1992. The next year, Ford installed the switch in the F–Series line of vehicles. The design of the switch and its component parts has remained unchanged since its initial installation in the panther platform line of vehicles in 1992.

One month after the 1999 recall of the panther platform vehicles, a group of scientists employed by Ford produced an internal document, the Special Investigation Team Report (SIT Report), which analyzed the cause of the fires and proposed solutions to remedy the problem. In the report, dated June 11, 1999, Ford acknowledged it did not completely understand the cause of the fires. However, the report identified one of the potential causes as the failure of the kapton seal to prevent brake fluid from entering the electrical side of the switch. The report did not mention deviations in the manufacturing process at Texas Instruments as a reason for the fires. The report outlined ten possible solutions to remedy the fires. Ford did not implement any of these

proposed solutions and did not alter the kapton seal of the switch during the 1999 recall.

According to Ford's expert witness, Mark Hoffman, Ford neither incorporated the fixes proposed by the report nor altered the kapton seal because it determined that the seal's failure and the subsequent fires were caused by manufacturing problems at Texas Instruments. Specifically, Hoffman noted the change in the manufacturing process at Texas Instruments, from a manual to an automated system, resulted in component parts deviating from the specifications required by Ford. Accordingly, during the 1999 recall, Ford took two steps. First, it ensured that Texas Instruments resolved its manufacturing issues. Second, it replaced the switches in the panther platform series deviating from its specifications with switches conforming to its specifications.

The Duncans' expert, Jeff Morrill, made three observations when comparing the fire in the Duncans' Expedition to the fires in the recalled 1999 panther platform line of vehicles. First, the switches found in both were identical. Second, the fires were caused by the failure of the kapton seal to prevent brake fluid from entering into the electrical side of the switch. Third, Ford knew of the failure of the kapton seals before manufacturing the Duncans' 2000 Expedition as evidenced by the 1999 recall itself and the SIT Report. The Duncans then asked Kendrick Richardson, an expert in mechanical engineering, whether Ford breached the engineering standard of care, assuming the above observations reached by Morrill were correct. Richardson responded in the affirmative. The trial court precluded Ford from cross-examining Morrill and Richardson about the manufacturing problems at Texas Instruments, ruling this line of questioning was irrelevant.[1]

The jury returned a verdict in favor of the Duncans, awarding them $620,759.79 in actual damages, reduced to $589,721.80 in proportion to their comparative fault, and $3 million in punitive damages. This appeal followed.

---

1. At the time of the trial court's ruling, both parties acknowledged that Ford, not Texas Instruments, was liable for the defective switch after installing it into its vehicles. In addition, neither party had introduced evidence of manufacturing problems at Texas Instruments.

## STANDARD OF REVIEW

"[T]he admission or exclusion of evidence in general is within the sound discretion of the trial court." *Fields v. Reg'l. Med. Ctr. Orangeburg,* 363 S.C. 19, 25, 609 S.E.2d 506, 509 (2005). "To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or lack thereof." *Id.* at 26, 609 S.E.2d at 509. Appellate courts apply a de novo standard of review in determining whether an award of punitive damages is constitutionally excessive. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). However, the factual findings made by the district court in conducting the excessiveness inquiry must be accepted unless clearly erroneous. *Id.* at 435, 121 S.Ct. 1678.

## LAW/ANALYSIS

### I. EVIDENTIARY ISSUES

A. Qualifications of Jeff Morrill

At trial, Jeff Morrill was qualified as an expert in the field of cause and origin of fire; however, the trial court found he was not qualified to offer design opinions. Ford asserts the trial court erred by allowing Morrill to present design opinions. Ford alleges Morrill gave design opinions when he testified about the reasons for the 1999 and 2005 recalls. In addition, Ford argues Morrill presented a design opinion when he concluded the cause of the recalls was the same. Lastly, Ford claims the trial court erred by allowing Morrill to testify about the 1999 SIT Report because he never worked for Ford and had no firsthand knowledge regarding the 1999 recall or the report. We disagree.

The qualification of an expert witness and the admissibility of expert testimony are matters within the discretion of the trial court. *Gooding v. St. Francis Xavier Hosp.,* 326 S.C. 248, 252, 487 S.E.2d 596, 598 (1997). A trial court's ruling on the admissibility of expert testimony constitutes an abuse of discretion when the ruling is manifestly arbitrary, unreasonable, or unfair. *Means v. Gates,* 348 S.C. 161, 166, 558 S.E.2d

921, 924 (Ct.App.2001). "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Rule 703, SCRE.

Contrary to Ford's assertions, Morrill testified exclusively in his area of expertise—cause and origin of fire—and never offered any design opinions. He testified that Ford recalled both lines of vehicles because of under-hood fires. Next, Morrill stated the cause of the fires in both lines of vehicles was due to the failure of the kapton seal to prevent brake fluid from entering the electrical side of the switch. Morrill never testified that the kapton seal was defectively designed; rather, he only stated it caused fires. As an expert in cause and origin of fire, Morrill was qualified to offer such an opinion. In forming his conclusion, Morrill relied on the SIT Report. Because he relied on the report in forming his opinion, Morrill could testify about the report, regardless of whether he possessed firsthand knowledge of the report, the recalls, or worked at Ford. *See Hundley ex. rel. Hundley v. Rite Aid of S.C., Inc.*, 339 S.C. 285, 295, 529 S.E.2d 45, 50 (Ct.App.2000) ("An expert witness may state an opinion based on facts not within his firsthand knowledge."); *State v. Slocumb*, 336 S.C. 619, 640, 521 S.E.2d 507, 518 (Ct.App.1999) (noting an expert may testify about the facts or data upon which he or she bases an opinion, as long as they are of a type reasonably relied upon by other experts in the field). Accordingly, the trial court properly allowed Morrill to testify in his area of expertise at trial and further, did not err in allowing him to base his opinion on the SIT Report.

## B. Richardson Hypothetical

Next, Ford argues the trial court erred by allowing the Duncans to ask Kendrick Richardson whether Ford breached its engineering standard of care based on the conclusions of Morrill. Ford asserts the question was misleading because it failed to mention the manufacturing problems at Texas Instruments that led to the 1999 recall. We disagree.

An expert can offer opinions based upon hypothetical questions embracing facts supported by the evidence. *Gazes v. Dillard's Dep't. Store, Inc.*, 341 S.C. 507, 514, 534 S.E.2d

306, 310 (Ct.App.2000). A hypothetical question need not include all of the details in a particular case. *Brown v. La France Indus.*, 286 S.C. 319, 327, 333 S.E.2d 348, 353 (Ct.App. 1985). It is sufficient that substantially all the material facts necessary to the formation of an intelligent opinion are included in the hypothetical question. *Id.*

We have already determined Morrill was qualified to offer the testimony he presented at trial. As a result, Richardson, an expert in the field of mechanical engineering, could give his opinion as to whether Ford breached its engineering standard of care based on Morrill's conclusions. *See Gazes*, 341 S.C. at 514, 534 S.E.2d at 310 (noting an expert can answer hypothetical questions based upon evidence admitted at trial). In addition, the question was not misleading even though it omitted the manufacturing problems at Texas Instruments. The question was based on Morrill's testimony and the SIT Report. Neither Morrill's Testimony nor the SIT Report referred to manufacturing issues at Texas Instruments. Therefore, the trial court did not abuse its discretion by allowing Richardson to respond to the hypothetical question posed by the Duncans.

C. Cross-examination of Morrill and Richardson

Ford asserts the trial court erred in preventing it from asking the Duncans' experts, Morrill and Richardson, who manufactured the switch and why Ford decided to recall the panther platform line of vehicles in 1999. We disagree.

"The scope of cross-examination rests largely in the discretion of the trial court." *Watson ex rel. Watson v. Chapman*, 343 S.C. 471, 482, 540 S.E.2d 484, 489 (Ct.App. 2000). To warrant the reversal of a limitation placed on the scope of cross-examination by the trial court, a manifest abuse of discretion and prejudice must be demonstrated. *Vacation Time of Hilton Head Island, Inc. v. Lighthouse Realty, Inc.*, 286 S.C. 261, 266, 332 S.E.2d 781, 784 (Ct.App.1985). A manufacturer who incorporates into his product a component made by another has a responsibility to test and inspect such component, and his negligent failure to properly perform such duty renders him liable for injuries proximately caused as a consequence. *Nelson v. Coleman Co.*, 249 S.C. 652, 657, 155

S.E.2d 917, 920 (1967); *see* S.C.Code Ann. § 15–73–10 (2005) ("One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property. . . .") (*emphasis added*).[2]

Initially, the trial court did not err in preventing Ford from asking Morrill and Richardson who manufactured the switch. As *Nelson* makes clear, Ford was legally responsible for the switch in the event it failed and caused damage because it incorporated the switch manufactured by Texas Instruments into its vehicles. 249 S.C. at 657, 155 S.E.2d at 920. Therefore, the fact Texas Instruments manufactured the switch was irrelevant. *See* Rule 611(b), SCRE ("A witness may be cross-examined on any matter relevant to any issue in the case. . . ."). Next, we believe the trial court acted within its discretion in precluding Ford from asking the Duncans' experts why it decided to recall the panther platform line of vehicles in 1999. Ford produced no evidence in support of its contention that the 1999 recall was prompted by manufacturing defects at Texas Instruments either before or during the cross-examination of Morrill and Richardson. Because no evidence supported Ford's claim that the 1999 recall was prompted by manufacturing defects at Texas Instruments, the trial court acted within its discretion in preventing Ford from questioning the Duncans' experts in that regard. At this point in the trial, Ford's contention that manufacturing defects at Texas Instruments caused it to recall vehicles in 1999 amounted to mere conjecture. *See State v. Johnson*, 338 S.C. 114, 124, 525 S.E.2d 519, 524 (2000) (noting a trial court may limit cross-examination that is only marginally relevant). Accordingly, the trial court acted within its discretion.

Moreover, even if the trial court committed error, Ford did not suffer any prejudice. *See Fields*, 363 S.C. at 25, 609 S.E.2d at 509 (holding reversal based on the admission or exclusion of evidence is not warranted absent a showing of both error and resulting prejudice). After preventing Ford

---

**2.** For liability to attach under the statute, the seller must also be in the business of selling the defective product, and the product must be expected to and ultimately reach the consumer without a substantial change in condition. § 15–73–10 (2005).

from cross-examining the Duncans' experts about Ford's reason for the 1999 recall, the trial court later gave Ford the opportunity to recall Morrill and Richardson to the witness stand and ask them about Ford's reason for the 1999 recall. Ford, however, chose not to do so. In addition, Ford's expert, Mark Hoffman, testified about the manufacturing defects at Texas Instruments as the reason for the 1999 recall. This was precisely the information Ford sought to elicit from the Duncans' experts during cross-examination. *See Baber v. Greenville County*, 327 S.C. 31, 41, 488 S.E.2d 314, 320 (1997) ("There is no error in excluding testimony which is subsequently admitted into evidence."); *S.C. Dep't. of Highways & Pub. Transp. v. Galbreath*, 315 S.C. 82, 86, 431 S.E.2d 625, 628 (Ct.App.1993) ("Even if the trial court erred in excluding evidence, there is no reversible error where the testimony would have been cumulative."). Thus, even assuming the trial court committed error in limiting the scope of Ford's cross-examination, such error does not warrant reversal on appeal because Ford did not suffer any prejudice as a result.

D. 1999 Recall of Panther Platform Vehicles

■ Ford contends the trial court erred by admitting the 1999 recall of the panther platform line of vehicles into evidence. Ford asserts the switch failure in the recalled panther platform line of vehicles was not substantially similar to the alleged switch failure in the Duncans' Expedition. Ford argues the switch failure and subsequent recall of the 1999 panther platform line of vehicles was due to manufacturing deviations at Texas Instruments. By contrast, Ford asserts the Duncans' Expedition contained a switch meeting Ford's specifications. We disagree.

The trial court did not abuse its discretion by allowing the 1999 recall of the panther platform line of vehicles into evidence. Ford concedes the recalled panther platform vehicles contained a switch with the same design and same component parts as the switch found in the Duncans' Expedition. Moreover, Ford's expert, Mark Hoffman, acknowledged Ford recalled the panther platform vehicles because a failure in the kapton seal allowed brake fluid to enter the electrical side of the switch. Duncans' expert, Jeff Morrill, testified the fire in the Duncans' Expedition started because of an identical failure of the kapton seal. These facts demonstrate that the under-

hood fires that prompted the 1999 recall of the panther platform line of vehicles were substantially similar to the under-hood fire in the Duncans' Expedition, which caused their home to be destroyed. *See Whaley v. CSX Transp., Inc.,* 362 S.C. 456, 483, 609 S.E.2d 286, 300 (2005) (noting other incidents must be substantially similar to be relevant and admissible in a products liability action).

### E. Emotional Distress

■■■ Ford argues the trial court erred by submitting Anna Duncan's claim for emotional distress to the jury in the absence of expert testimony. In addition, Ford contends the trial court erred by charging the jury that the "plaintiffs" may recover for emotional distress when only Anna presented evidence of emotional distress. We disagree.

Exclusive of the Duncans' claim for emotional distress, Jerry Duncan testified that they sustained $627,958.59 in actual damages.[3] The jury awarded the Duncans $620,759.79 in actual damages. Therefore, because the jury verdict is less than the evidence of actual damages presented at trial, the verdict should not be disturbed on appeal. *See Burns v. Universal Health Servs., Inc.,* 361 S.C. 221, 232, 603 S.E.2d 605, 611 (Ct.App.2004) (stating the verdict will be upheld if any evidence sustains the factual findings implicit in the jury's verdict).

### F. Threadgill Appraisal

■■■ Ford contends the trial court abused its discretion by not admitting Jack Threadgill's appraisal of the Duncans' home into evidence because it qualified as a business record.[4] At a minimum, Ford argues Threadgill's appraisal should have been admissible to impeach Keith Ridgeway's appraisal of the Duncans' home because Ridgeway relied on the factual information of Threadgill's appraisal.[5] We disagree.

---

3. $440,000 for the house, $156,120.32 for personal items, $21,000 for the use of the house, $9,734.47 for landscaping, $898.80 in hotel stays, and $205.00 electrician fees.

4. Threadgill was deceased at the time of the trial.

5. Threadgill valued the Duncans' home at $251,415.00, while Ridgeway valued it at $295,711.00.

■ A report kept in the course of regularly conducted business activity is admissible unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. Rule 803(6), SCRE. However, subjective opinions and judgments found in business records are not admissible. *Id.*

■ The trial court did not abuse its discretion by excluding Threadgill's appraisal of the Duncans' home. Ford only sought to introduce the document to show the value Threadgill assigned to the home. The business records exception does not allow subjective opinions to be introduced into evidence. Threadgill's valuation of the Duncans' home was nothing more than a subjective opinion. In the alternative, Ford argues the objective factual portions of Threadgill's appraisal should have been admissible at trial. However, Ford never sought to introduce the factual portions of Threadgill's appraisal at trial; rather, Ford only sought to admit Threadgill's estimate of the value of the Duncans' home. Accordingly, Ford's argument concerning the factual portions of the Threadgill appraisal is not preserved for appellate review. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693–94 (2003) (stating issues not raised and ruled upon in the trial court will not be considered on appeal).

## II. PUNITIVE DAMAGES

### A. Reckless, Willful, or Wanton Conduct

■ Ford contends the jury's award of punitive damages should be reversed because its conduct did not rise to the level of reckless, willful, or wanton. Ford contends it had no notice that switches meeting its manufacturing specifications would cause fires. Ford argues the Duncans' Expedition, unlike the recalled panther platform line of vehicles, contained a properly manufactured switch. Although Ford acknowledges the recalled panther platform line of vehicles contained a switch matching the same design and containing the same component parts as the switch in the Duncans' Expedition, it asserts that the fires under the hood of the panther platform line of vehicles were caused by deviations in the manufacturing process at Texas Instruments. We disagree.

██ Under South Carolina law, punitive damages may be awarded to punish tortfeasors who have acted in a "reckless, willful, or wanton" manner. *Taylor v. Medenica,* 324 S.C. 200, 221, 479 S.E.2d 35, 46 (1996). The plaintiff must prove punitive damages by clear and convincing evidence. S.C.Code Ann. § 15–33–135 (2005). Clear and convincing evidence is: "that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be established." *Anderson v. Augusta Chronicle,* 355 S.C. 461, 473, 585 S.E.2d 506, 512 (Ct.App.2003). The clear and convincing standard is the highest burden of proof known to civil law. *Austin v. Specialty Transp. Servs., Inc.,* 358 S.C. 298, 313, 594 S.E.2d 867, 875 (Ct.App.2004).

Clear and convincing evidence supports the jury's award of punitive damages. Here, Ford knew the kapton seal it installed in automobiles could fail and that such failure was causing fires before manufacturing the Duncans' Expedition in December 1999. Shortly after recalling the panther platform line of vehicles in May 1999, Ford assigned a group of scientists to investigate the cause of the under-hood fires in the panther platform vehicles. The scientists detailed their findings in the SIT Report, dated June 11, 1999, and identified the failure of the kapton seal to prevent brake fluid from penetrating it as a potential cause of the fires. Ford argues manufacturing deviations at Texas Instruments prompted the 1999 recall and caused the kapton seal to fail. However, Ford never produced any document and only one witness, a mechanical engineer at Ford, to support this claim. In fact, the SIT Report never mentioned the manufacturing problems at Texas Instruments. Thus, the evidence clearly demonstrates Ford had knowledge, as of June 11, 1999, the kapton seal could fail and that this failure could cause fires. In spite of this knowledge, Ford did not make any changes to the switch itself or to the kapton seal; in fact, Ford installed a switch in the Duncans' Expedition in December 1999 that was virtually identical to that previously installed in the recalled vehicles.[6] This conduct rises to the level of reckless, willful, and wanton.

---

**6.** Ford repeatedly argues the SIT Report is being read out of context. However, the document is straight-forward. It establishes potential causes of the under-hood fires and offers solutions on how to fix them.

B. Jury Instructions

■ Ford argues the trial court should have instructed the jury not to consider conduct occurring outside of South Carolina or harm to non-parties when deciding whether to award punitive damages. Ford contends evidence of two nationwide recalls created a risk that the jury might award punitive damages to the Duncans on these improper bases. We disagree.

■ "The practice of awarding punitive damages originated in principles of criminal law to deter the wrongdoer and others from committing like offenses in the future." *James v. Horace Mann Ins. Co.*, 371 S.C. 187, 193, 638 S.E.2d 667, 670 (2006) (citing *Laird v. Nationwide Ins. Co.*, 243 S.C. 388, 393, 134 S.E.2d 206, 210 (1964)). Because of the quasi-criminal nature of punitive damages, the process of assessing punitive damages is subject to the protections of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Atkinson v. Orkin Exterminating Co.*, 361 S.C. 156, 164, 604 S.E.2d 385, 389 (2004). The United States Supreme Court has interpreted the Due Process Clause to prohibit a state from imposing punitive damages to punish a defendant for unlawful acts committed outside of the state's jurisdiction. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). "[T]he Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon non-parties or those whom they directly represent...." *Philip Morris v. Williams*, 549 U.S. 346, 353, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007). When the evidence and arguments submitted in the case create a risk of improper punishment, the trial court must, upon request, properly instruct the jury on the constitutional limits of punitive damages. *Id.* at 357, 127 S.Ct. 1057.

■ Neither the evidence nor the arguments in this case necessitated the jury charge argued by Ford. The Due Process Clause does not require the jury charge advanced by Ford. The Due Process Clause only requires such a charge·

---

According to the report, one of the two causes of the fires is the failure of the kapton seal.

when the evidence or arguments presented at trial create a risk that the jury may award punitive damages for conduct occurring outside of the state or for harm to non-parties. *Id.* at 357, 127 S.Ct. 1057. Contrary to Ford's assertions, the Duncans did not introduce evidence creating such a risk. The Duncans introduced the 1999 recall solely for the purpose of demonstrating Ford's knowledge of the defective kapton seal at the time it installed the same kapton seal in the Duncans' Expedition. In addition, the Duncans introduced the 2005 recall of the Ford Expedition to demonstrate that the recall was due to the same failure of the kapton seal that the Duncans claimed caused the fire in their Expedition. As the United States Supreme Court stated in *TXO Prod. Corp. v. Alliance Res. Corp.*, a plaintiff can introduce evidence of out-of-state conduct to demonstrate the degree of reprehensibility of the defendant's conduct. 509 U.S. 443, 462 n. 28, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). Simply put, the Duncans only introduced evidence of nationwide recalls to demonstrate the reckless or willful nature of Ford's conduct in this case. The Duncans never offered any evidence of how many automobiles Ford recalled or how many injuries the under-hood fires caused. Accordingly, the Due Process Clause did not require the jury charge suggested by Ford.

## C. Ford's Wealth

 At trial, the Duncans called Dr. Oliver Wood to testify about Ford's general wealth and its financial ability to respond to an award of punitive damages. During his testimony, Wood testified as to Ford's net worth, assets, gross profits, and the amount of compensation it paid executives. Ford argues the trial court should not have allowed Wood to testify because his testimony invited the jury to return an award of punitive damages against it based solely on its financial well-being.[7] In particular, Ford argues the amount of compensation it paid executives lacked any relationship to its financial ability to respond to punitive damages and was nothing more than a transparent attempt to appeal to the jury's passion. We disagree.

---

7. Ford offered to stipulate that it had the ability to pay an award of punitive damages.

In *Frazier v. Badger*, the South Carolina Supreme Court reaffirmed the proposition that a defendant's ability to pay is a relevant factor in assessing punitive damages. 361 S.C. 94, 106, 603 S.E.2d 587, 593 (2004) (citing *Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258 (1958)). In *Pac. Mut. Life Ins. Co. v. Haslip*, the United States Supreme Court stated the "financial position" of the defendant is one factor that can be taken into account in assessing punitive damages. 499 U.S. 1, 20, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). However, the Supreme Court later acknowledged that evidence of a defendant's wealth creates the potential that juries will use their verdicts to compensate plaintiffs in an arbitrary fashion. *Campbell*, 538 U.S. at 417, 123 S.Ct. 1513; *see also BMW of N.Am. Inc. v. Gore*, 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.").

The trial court properly allowed Wood to testify about Ford's ability to respond to a punitive damages award. During his testimony, Wood testified beyond the mere net worth of Ford and informed the jury of Ford's assets, gross profits, and the amount of compensation it paid executives. Appellate courts in our state have allowed testimony beyond a defendant's mere net worth to establish its ability to pay a punitive damages award. *See Bryant v. Waste Mgmt., Inc.*, 342 S.C. 159, 170, 536 S.E.2d 380, 386 (Ct.App.2000) (allowing testimony of the defendant's assets, liabilities, net worth, shareholders' equity, operating revenue, and net income per day to establish whether the defendant could pay punitive damages). In addition, Wood's testimony concerning the state of Ford's economic affairs allowed the jury to follow the instructions of the trial court and "punish the defendant but not [e]ffect economic bankruptcy." Therefore, the trial court properly allowed Wood to testify about Ford's ability to pay punitive damages and such testimony did not offend the Due Process Clause.[8]

---

8. We note this issue may not be preserved for appellate review. Prior to Wood's testimony, Ford asked the court to prevent Wood from testifying about Ford's wealth. The trial court denied Ford's request, stating "I will allow him to testify as to [the] ability [of] Ford … to pay a punitive damages award." However, the trial court informed Ford

### D. The Gore Guideposts [9]

There are procedural and substantive constitutional limitations on the award of punitive damages. *Campbell,* 538 U.S. at 416, 123 S.Ct. 1513. In *Gore,* the United States Supreme Court identified three guideposts to be considered when analyzing whether a punitive damage award is unconstitutionally excessive: (1) the reprehensibility of the defendant's conduct; (2) the ratio between the punitive damages award and the plaintiff's harm as measured by compensatory damages; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. 517 U.S. at 575–83, 116 S.Ct. 1589.

#### 1. Reprehensibility of Ford's Conduct

The principle that punishment should fit the crime is deeply rooted in common-law jurisprudence. *Id.* at 576 n. 24, 116 S.Ct. 1589. Likewise, the amount of punitive damages imposed on a defendant should reflect "the enormity of his offense." *Id.* at 575, 116 S.Ct. 1589. The Supreme Court has stated that "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Campbell,* 538 U.S. at 419, 123 S.Ct. 1513. The Supreme Court has instructed courts to determine the reprehensibility of a defendant's conduct by considering whether:

---

"I'll just have to deal with his testimony on any objections you may have ... because I think some of it is probably appropriate and some of it is probably not." When Wood testified in regards to Ford's wealth, Ford failed to object. *See State v. Kirton,* 381 S.C. 7, 43, 671 S.E.2d 107, 125 (Ct.App.2008) ("To preserve an issue for review there must be a contemporaneous objection that is ruled upon by the trial court.").

**9.** We find the trial court conducted a proper post-trial review of the punitive damages award pursuant to *Gamble v. Stevenson,* 305 S.C. 104, 111–12, 406 S.E.2d 350, 354 (1991). The *Gamble* factors include: (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and (8) other factors deemed appropriate. *Id.*

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* In *Campbell,* the Court went on to state "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

 The conduct in this case caused only economic harm as the fire destroyed the Duncans' home and all of their personal possessions. Accordingly, this factor weighs in favor of Ford. However, the fact that the conduct in question caused economic, rather than physical, harm does not end our inquiry.[10] As the Supreme Court stated in *Gore,* "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." 517 U.S. at 576, 116 S.Ct. 1589. Accordingly, we continue our analysis.

Moving forward, we find Ford acted with reckless disregard for the health and safety of others by installing a switch in the Duncans' Expedition, which it knew could fail and cause fires. The facts of this case reveal that Ford knew two things before manufacturing the Duncans' Expedition in December 1999. First, as evidenced by the May 1999 recall of the panther platform line of vehicles, Ford knew its vehicles possessed a propensity to cause under-hood fires. Second, as evidenced by the SIT Report, dated June 11, 1999, Ford knew a potential cause of the fires was the failure of the kapton seal to prevent brake fluid from entering the electrical side of the switch. Nonetheless, Ford took no steps to remedy the problem before manufacturing the Duncans' Expedition.[11] Instead,

---

**10.** Appellate courts in this state have allowed plaintiffs to recover punitive damages when the defendant's conduct caused only economic harm. *James v. Horace Mann Ins. Co.,* 371 S.C. 187, 196, 638 S.E.2d 667, 672 (2006); *Jordan v. Holt,* 362 S.C. 201, 203–04, 608 S.E.2d 129, 130 (2005); *Collins Entm't. Corp. v. Coats & Coats Rental Amusement,* 355 S.C. 125, 141, 584 S.E.2d 120, 129 (Ct.App.2003).

**11.** The SIT Report proposed ten solutions to remedy the under-hood fires. Ford failed to implement any of the proposed solutions in the report.

when Ford manufactured the Duncans' Expedition, it installed a switch matching the same design and containing the same component parts as the recalled panther platform line of vehicles. In short, Ford installed a switch into the Duncans' Expedition that it knew could cause fires.[12] This conduct clearly amounts to a reckless disregard for the health and safety of others.

In addition, Ford did not simply install a rogue switch in the Duncans' Expedition which failed and caused the vehicle to ignite into flames. Rather, Ford displayed a pattern of installing switches in its automobiles that caused fires. *See id.* at 577, 116 S.Ct. 1589 ("Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance."). This fact is clearly demonstrated by Ford's recall of the panther platform line of vehicles. In May 1999, Ford recalled the panther platform line of vehicles because of under-hood fires. One month later, in the SIT Report, a group of scientists at Ford identified a defective switch as a potential cause of the fires. However, as mentioned above, Ford did nothing to cure the defect in the switches. In fact, the same defect that caused fires under the hood of the recalled panther platform vehicles—the failure of the kapton seal to prevent brake fluid from entering the electrical side of the switch—also caused the fire under the hood of the Duncans' Expedition. Accordingly, Ford repeatedly installed a defective switch in its automobiles; in turn, the same defect in the switch itself caused fires both in the recalled panther platform line of vehicles and the Duncans' Expedition.

Lastly, we find the harm in this case was not the result of intentional malice, trickery, or deceit.[13] That being said, the

---

12. Ford argues it did not know switches manufactured to its specifications could fail and cause fires. In order to accept Ford's argument, we would have to agree with Ford that the 1999 recall and the under-hood fires in the panther platform line of vehicles were the result of manufacturing deviations at Texas Instruments. As we have stated throughout this opinion, Ford simply failed to demonstrate this at trial.

13. The financial vulnerability of the Duncans is not appropriate to consider in determining the reprehensibility of Ford in this case. The

harm was not the result of a mere accident at Ford. To the contrary, the evidence demonstrates Ford installed a defective switch in the Duncans' Expedition with the knowledge that the switch could fail and cause fires. In analyzing this factor of reprehensibility, we are cognizant of the fact that an award of punitive damages may not be "grossly out of proportion to the severity of the offense." *Id.* at 576, 116 S.Ct. 1589. While Ford's conduct did not rise to the level of intentional malice, trickery, or deceit, Ford's act of installing a switch in the Duncans' Expedition that it knew could cause fires amounts to affirmative misconduct.

After considering all of the aggravating factors associated with reprehensible conduct as set forth in *Campbell,* we conclude that Ford's installation of a defective switch in the Duncans' Expedition: evidenced a reckless disregard for the health and safety of others; displayed a pattern of installing switches in its automobiles that caused fires; and amounted to affirmative misconduct. Accordingly, we find Ford engaged in sufficiently reprehensible conduct so as to justify the jury's award of three million dollars in punitive damages.

2. Reasonableness of Punitive Damages Award

■■■ The United States Supreme Court has refused to identify concrete constitutional limits on the ratio between punitive and actual damages. *Gore,* 517 U.S. at 582, 116 S.Ct. 1589. However, the Supreme Court has consistently pointed out that a reasonable relationship between punitive and actual damages must exist. *Id.* at 580, 116 S.Ct. 1589. The Court has stated "in practice few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. Simply put, "single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution . . . ." *Id.*

■■ The reasonableness of a punitive damages award cannot be determined simply by examining the relationship between the punitive damages award and the actual damages award. *See Gore,* 517 U.S. at 582, 116 S.Ct. 1589 ("[W]e have

inapplicability of this factor to the case before us does not weigh in favor of Ford or against the Duncans in our analysis.

consistently rejected the notion that the constitutional line is marked by a simple mathematical formula. . . ."). As the Supreme Court has made clear, the potential harm the defendant's conduct could have caused the plaintiff may also be considered. *Williams*, 549 U.S. at 354, 127 S.Ct. 1057; *See Gore*, 517 U.S. at 581, 116 S.Ct. 1589 ("[T]he proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.") (emphasis in original) (quoting *Haslip*, 499 U.S. at 21, 111 S.Ct. 1032). In the end, a general concern of reasonableness drives our inquiry. *TXO*, 509 U.S. at 458, 113 S.Ct. 2711.

In light of the harm caused by Ford's conduct, and the potential harm Ford's conduct could have caused to the Duncans, we find the punitive damages award in this case was reasonable. In this case, the Duncans sustained a significant economic loss as a result of Ford's conduct. Ford's installation of a defective switch in the Duncans' vehicle caused the vehicle to ignite into flames. The resulting fire destroyed the Duncans' home along with all of their personal possessions. Aside from the actual harm suffered by the Duncans, Ford's conduct threatened to inflict serious physical injury to the Duncans as well. With these considerations in mind, we hold the jury's award of punitive damages, amounting to 5.087 times the actual damages awarded in this case, was reasonable.[14]

### 3. Comparable Civil Fines

Appellate courts must compare the punitive damages award with the civil or criminal penalties that could be imposed for comparable misconduct.[15] *Gore*, 517 U.S. at 583,

---

**14.** Appellate courts in this state have affirmed punitive damage awards exceeding the ratio in this case. *See James*, 371 S.C. at 196, 638 S.E.2d at 672 (upholding a punitive damages award 6.82 times the actual damages award); *Collins Entm't.*, 355 S.C. at 141, 584 S.E.2d at 129 (affirming punitive damages award that was ten times the amount of the actual damages award).

**15.** More recently, the Supreme Court has questioned the utility of considering criminal penalties when determining monetary awards. *Campbell*, 538 U.S. at 428, 123 S.Ct. 1513.

116 S.Ct. 1589. In doing so, reviewing courts "should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.*

Here, the Duncans were awarded three million dollars in punitive damages. The South Carolina legislature has not adopted legislation that levies fixed civil fines against automobile manufacturers for the manufacturer of vehicles with defective parts. Our state's general products liability statute is the closest piece of legislation contemplating the factual scenario before us. S.C.Code Ann. § 15–73–10 (2005). It is of very little aid in our analysis because it does not fix civil fines; rather, it merely imposes "liability" on manufacturers who sell products in a defective condition. *Id.* Under federal law, an automobile manufacturer that violates a safety standard, a recall procedure, or manufactures a defective vehicle is liable to the federal government for a civil penalty of no more than $5,000 for each violation, with the maximum penalty not to exceed $15 million. 49 U.S.C.A. § 30165(a)(1) (West.2005).

In previous cases, our appellate courts have faced similar problems when attempting to compare the punitive damages award with possible civil fines that could be imposed against the defendant for similar misconduct. In *Collins,* this court observed there were no "legislative judgments imposing civil or criminal penalties" for the conduct in question. 355 S.C. at 142, 584 S.E.2d at 129. Likewise, in *James,* our supreme court noted the applicable statutes imposed civil fines not to exceed $30,000 for each violation. 371 S.C. at 197, 638 S.E.2d at 672. In both cases, our appellate courts affirmed a punitive damages award exceeding the ratio between punitive and actual damages present in this case. *See id.* at 196, 638 S.E.2d at 672 (upholding a punitive damages award 6.82 times the actual damages award); *Collins,* 355 S.C. at 141, 584 S.E.2d at 129 (affirming punitive damages award that was 10 times the amount of the actual damages award). In doing so, both cases stated "the statutory penalties are set at such a low level, there is little basis for comparing it with any meaningful punitive damage award." *James,* 371 S.C. at 197, 638 S.E.2d at 672; *Collins,* 355 S.C. at 142, 584 S.E.2d at 129. The applicable civil fines in this case lead us to the same conclusion. After reviewing the guideposts established by the Supreme Court in *Gore,* we find the jury's award of three million

148

dollars in punitive damages was not unconstitutionally excessive.

Accordingly, the decision of the circuit court is

**AFFIRMED.**

SHORT, J., and KONDUROS, J., concur.