701 S.E.2d 742

**HARRIS TEETER, INC., Appellant,**

**v.**

**MOORE & VAN ALLEN, PLLC and W. Howell Morrison, Respondents.**

No. 26887.

Supreme Court of South Carolina.

Heard Feb. 18, 2010.

Decided Nov. 1, 2010.

Rehearing Denied Dec. 1, 2010.

276

A. Camden Lewis, Mary G. Lewis, and Ariail E. King, all of Lewis & Babcock, of Columbia, for Appellant.

G. Trenholm Walker, Clayton B. McCullough, and Daniel S. McQueeney, Jr., all of Pratt–Thomas & Walker, of Charleston, for Respondents.

Justice KITTREDGE.

This is a legal malpractice action in which the trial court granted summary judgment to the law firm of Moore & Van Allen, PLLC and attorney W. Howell Morrison (Respondents). We certified the appeal of Harris Teeter, Inc. pursuant to Rule 204(b), SCACR. We affirm.

## I.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Rule 56(c), SCRCP; *see also Hancock v. Mid–South Mgmt. Co., Inc.*, 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009) ("[I]n cases applying the preponderance of the evidence burden of proof, the non-moving party is only required to submit a mere scintilla of evidence in order to withstand a motion for summary judgment."); *David v. McLeod Reg'l Med. Ctr.*, 367 S.C. 242, 247, 626 S.E.2d 1, 3 (2006) ("In determining whether any triable issues of fact exist, the court must view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the non-moving party."). Having carefully reviewed the record under the appropriate standard, we find Respondents are entitled to judgment as a matter of law.

## II.

## FACTUAL/PROCEDURAL BACKGROUND

This claim arises from Respondents' representation of Harris Teeter in an arbitration proceeding concerning a lease dispute.

## A.

In 1979, Harris Teeter leased property to operate a super-market on East Bay Street in Charleston, South Carolina. The lease term was twenty-five years with five renewal options of five years each. The lease required Harris Teeter to pay base rent to the property owner in the amount of $14,074 a month, or $176,448 annually, as well as percentage rent if Harris Teeter's net sales exceeded $16,400,000 annually. The 1979 lease was considered an under-market lease and thus favorable to Harris Teeter.

In 2001, East Bay Venture, LLC (EBV) purchased the property and became Harris Teeter's landlord. A dispute over lease terms promptly surfaced involving the following lease provisions, which required Harris Teeter to: (1) insure the property for its "insurable value" with responsible insurance companies authorized to do business in South Carolina and (2) pay "all costs and expenses of every kind and nature whatsoever relating to the demised premises ... except rent interruption insurance, which shall be carried by the Landlord."

After acquiring the property, Marcus Durlach, III, acting on behalf of EBV, met with officers from Harris Teeter regarding these lease provisions, specifically Harris Teeter's responsibility, if any, for certain insurance and environmental costs associated with EBV's purchase of the property. Following the meeting, Harris Teeter contacted an attorney in North Carolina it used for lease matters.

Over the next year, Durlach attempted to contact Harris Teeter numerous times on behalf of EBV seeking reimbursement for the expenses, but Durlach's communications were largely ignored. Durlach eventually wrote Harris Teeter on November 11, 2002, formally demanding reimbursement for the costs. Harris Teeter forwarded the letter to its North Carolina attorney, but Harris Teeter did not respond to EBV's demand.

On December 3, 2002, Durlach sent Harris Teeter a letter declaring it in default under the lease.[1] In response to this

---

1. The lease explicitly provided that the tenant had ten days to cure any monetary default and thirty days to cure any nonmonetary default.

letter, Harris Teeter immediately retained a South Carolina law firm. This law firm advised Harris Teeter that it was not responsible for the disputed expenses and sent a letter to that effect to Durlach on December 30, 2002. During the cure period, however, no effort was made to cure any alleged default by, for example, paying the disputed expenses under protest. Durlach responded by terminating the lease on January 9, 2003.[2]

## B.

Following termination of the lease, Harris Teeter discharged that law firm and retained its third law firm, Respondents.

Respondents undertook efforts to rescind the lease termination; however, EBV's stance in negotiations was firm. EBV was unwilling to rescind the lease termination without concessions, most notably a substantial increase in base rent. Harris Teeter maintained the position throughout that EBV's posture was merely a pretext for EBV's desire to renegotiate the lease terms with Harris Teeter—for an increase in rent to reflect what EBV believed to be the true market value of the lease. Harris Teeter rejected EBV's April 28, 2003, offer of an increase to $300,000 in annual base rent.

On May 13, 2003, Harris Teeter, through Respondents, paid EBV the disputed expenses under protest "reserving all rights for reimbursement as determined in the arbitration proceeding under the Lease." Respondents continued negotiations with EBV, but EBV refused to rescind the lease termination absent a substantial increase in the base rent. On June 20, 2003, EBV made its final offer: a new fifteen-year lease, with an annual base rent of $475,000 for the first five years, $500,000 annually for the second five-year period, and $625,000 annually for the final five-year period. Keith Rudemiller, Harris Teeter's vice president for real estate, forwarded EBV's offer to Harris Teeter president Fred Morganthall. In a handwritten note accompanying the EBV offer, Rudemiller declared the offer "RIDICULOUS." Harris Teeter rejected the offer.

---

**2.** Harris Teeter also filed a malpractice claim against the first South Carolina law firm; that firm settled the claim.

## C.

The dispute proceeded to arbitration. Respondent Howell Morrison of Moore & Van Allen represented Harris Teeter at the arbitration. The parties agreed to select Lanneau Lambert as the arbitrator. There were two issues before the arbitrator. The first issue was whether Harris Teeter defaulted under the lease by failing to reimburse EBV for the costs associated in complying with the terms of the voluntary cleanup contract (VCC)[3] and obtaining flood insurance to cover Harris Teeter's $250,000 deductible. If the arbitrator answered this question in the affirmative, the second inquiry was whether the breach was material. The arbitrator rejected Harris Teeter's legal position and determined Harris Teeter had breached the lease and that the breach was material, thus terminating the lease.

Harris Teeter fired Respondents and hired another law firm to file a motion for reconsideration. While the reconsideration motion was pending, Harris Teeter and EBV settled the matter by agreeing to new lease terms, most notably a substantial increase in rent.

## D.

Thereafter, Harris Teeter filed a complaint against Respondents, alleging causes of action for professional negligence, breach of contract, and breach of fiduciary duty. The circuit court granted summary judgment in favor of Respondents with respect to all claims, only three of which Harris Teeter has pursued on appeal: the claims that Respondents committed malpractice by failing to (1) introduce any evidence in regards to two *Kiriakides*[4] factors; (2) advise Harris Teeter of

---

3. A VCC is a contract between the Department of Health and Environmental Control (DHEC) and a nonresponsible party pledging to clean up environmental contamination, enacted under the Brownfields/Voluntary Cleanup Program, codified at South Carolina Code sections 44–56–710 through 760 (2002). Under a VCC, the nonresponsible party agrees to clean up the contamination in return for liability protection from DHEC.

4. *Kiriakides v. United Artists Communications, Inc.*, 312 S.C. 271, 440 S.E.2d 364, 366 (1994).

the risk of lease termination; and (3) settle the case prior to arbitration.[5]

## III.

## LAW/ANALYSIS

 In order to prevail in a cause of action for legal malpractice, the plaintiff must prove: (1) the existence of an attorney-client relationship; (2) a breach of duty by the attorney; (3) damage to the client; and (4) proximate cause of the client's damages by the breach. *Rydde v. Morris,* 381 S.C. 643, 646, 675 S.E.2d 431, 433 (2009). "In South Carolina, attorneys are required to render services with the degree of skill, care, knowledge, and judgment usually possessed and exercised by members of the profession," *Holy Loch Distribs., Inc. v. Hitchcock,* 340 S.C. 20, 26, 531 S.E.2d 282, 285 (2000), and "[t]he standard to be applied in determining legal malpractice issues is statewide," *Smith v. Haynsworth, Marion, McKay & Geurard,* 322 S.C. 433, 437–38, 472 S.E.2d 612, 614 (1996). Finally, generally, a plaintiff in a legal malpractice action must establish this standard of care by expert testimony. *Id.* at 435, 472 S.E.2d at 613.

### A.

We summarily dispose of two of Harris Teeter's claims: (1) Respondents failed to advise Harris Teeter of the risk of lease termination; and (2) Respondents failed to settle the case prior to arbitration.

### (1) *Respondents failed to advise Harris Teeter of the risk of lease termination*

The record flatly refutes any suggestion that Respondents failed to advise Harris Teeter of the risk of lease termination. On the contrary, the record demonstrates that Respondents

---

5. Harris Teeter has not appealed from the circuit court's ruling with respect to the other claims against Respondents. Therefore, the circuit court's ruling on those claims is the law of the case. *See Ex parte Morris,* 367 S.C. 56, 65, 624 S.E.2d 649, 653–54 (2006) (stating an unappealed ruling is the law of the case).

provided Harris Teeter a candid assessment of the risk and consequences of lease termination.

On May 8, 2003, Respondents informed Julia Passmore, Harris Teeter's leased property manager, that Harris Teeter's legal position was not necessarily a "slam dunk." Respondents wanted to know if Harris Teeter was comfortable with the risk of "dispossession from the property." Respondents further warned Passmore "about the whims of arbitrators— and the consequences of termination." In Passmore's deposition, she acknowledged that Respondents were emphasizing "[t]hat we could lose the lease."

When Respondents candidly advised Harris Teeter of the realities of litigation and the prospect of losing the lease, Passmore accused Respondents of "sound[ing] wishey washey" in a May 14, 2003, email. There is no evidence to suggest Respondents failed to advise Harris Teeter of the risk of lease termination; instead, the record demonstrates precisely the opposite. In any event, the lease had been terminated by EBV before Respondents' representation of Harris Teeter.

### (2) *Respondents failed to settle the case prior to arbitration*

The record also negates Harris Teeter's claim that Respondents failed to settle the case prior to arbitration. Instead, the record shows that Harris Teeter had no interest in settling. For example, Respondents provided Passmore a copy of the *Kiriakides* opinion. Passmore forwarded the *Kiriakides* opinion to Rudemiller. Passmore's handwritten note to Rudemiller stated "[t]his is a S.C. Supreme Court Case that our attorneys think is relevant in our East Bay situation." And, when, prior to arbitration, Respondents relayed EBV's final settlement offer to Harris Teeter's Rudemiller, he declared the offer "RIDICULOUS."

Furthermore, even Harris Teeter's primary expert, Mark Levick, opined that Harris Teeter's legal position was strong and the dispute should have proceeded to arbitration. The suggestion that there is evidence of malpractice for failing to settle the case prior to arbitration borders on frivolity.

### (3) *Kiriakides*

We turn to Harris Teeter's remaining claim that Respondents committed malpractice by failing to introduce any evidence in regards to two of the *Kiriakides* factors. *Kiriakides,* 312 S.C. 271, 440 S.E.2d 364. *Kiriakides* is the controlling case in South Carolina for determining whether a tenant materially breached the terms of his lease agreement with a landlord so as to justify termination of the lease.

In *Kiriakides,* we held, "a lease may not be forfeited for a trivial or technical breach even when the parties have specifically agreed that 'any breach' gives rise to the right of termination." *Id.* at 275, 440 S.E.2d at 366. Instead, we stated, "to justify forfeiture, the breach must be material, serious, or substantial." *Id.* In order to determine whether the breach was material, we announced the following five factor test:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated [by damages] for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* at 276, 440 S.E.2d at 366–67 (citing Restatement (Second) of Contracts § 241 (1981)).

Harris Teeter argues Respondents breached their standard of care by failing to present evidence with regards to the following two *Kiriakides* factors: (1) the extent to which the injured party will be deprived of the benefit he reasonably expected; and (2) the extent to which the party failing to perform or offer to perform will suffer forfeiture. *Id.,* 440 S.E.2d at 366. We disagree.

The case proceeded to arbitration after Harris Teeter rejected EBV's final settlement proposal. In preparing for arbitration, Respondents submitted a pre-hearing memorandum to the arbitrator. In the memorandum, Respondents focused on whether Harris Teeter actually breached the lease, Durlach's motives for asserting a breach, and the materiality of any supposed breach. Respondents then cited to *Kiriakides,* the applicable case law, to support their argument:

Applicable South Carolina law is set forth in the case of *Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 440 S.E.2d 364, 366 (1994). (Copy attached) This state's supreme court held therein that a landlord's right to terminate a commercial leasehold is not unlimited and that termination must be tempered by notions of equity and common sense. The court found that, before a commercial landlord may evict, the default of the lease agreement must be material. "[W]e hold that a forfeiture for a trivial or immaterial breach of a commercial lease should not be enforced." *Id.* at 366. The *Kiriakides* court looked at the following factors:

(i) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(ii) the extent to which the injured party can be adequately compensated by damages for the part of that benefit of which he will be deprived;

(iii) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(iv) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and

(v) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith dealing.

Harris Teeter submits that the evidence as to each of these considerations weighs heavily in its favor and against the harsh remedy of termination.

Harris Teeter comes to this proceeding having dealt in good faith and with clean hands. As such, it seeks equity from the Arbitrator as supported by the decision in *Kiriak-*

*ides.* It has been forced to expend considerable amounts in attorneys' fees, which it will never recover. It does, however, seek return of monies, plus interest, that it has paid in protest to Landlord.

Respondents presented *Kiriakides* to the arbitrator, but made a tactical decision to focus on the materiality of the breach and not the precise extent of the cost of lease forfeiture to Harris Teeter.[6] Additionally, Respondents presented evidence concerning the value of the lease to Harris Teeter to the arbitrator and linked it to Durlach's motives for termination. Respondents' argument to the arbitrator included the following:

> The issues that were the history of this situation, Mr. Durlach seems to suggest that he was given a corporate brush-off and not paid enough attention to, or something. I think the testimony is that Harris Teeter is a very responsible corporate operation and responsive corporate operation. They communicated a number of different ways through a number of different people with their landlord. And that this effort—I think the totality of this situation suggests that this effort to terminate is as much about this low market lease as it is about anything to do with alleged breaches.
>
> Of course Mr. Durlach would like to bring Harris Teeter back to the table, when it has renewal options until 2025, to renegotiate what he would like to say is a market lease with the gun pointed at our head of termination otherwise. I mean, wouldn't anybody want to in that negotiating position?
>
> * * *
>
> So what we have now, we believe, is an effort by the landlord to take nonbreaches or—or fairly debatable misunderstandings, differences of opinion about application, at

---

**6.** The East Bay store has been a financial boon for Harris Teeter. Harris Teeter has annual sales in excess of two billion dollars, and the East Bay store has annual sales of twenty-four million dollars. Soon after EBV purchased the property and lease questions remained unresolved, Harris Teeter inquired about the potential to acquire the property. As Passmore testified at the arbitration, "Yes, I did make a telephone call to Mr. Durlach at the request of the president of Harris Teeter to ask Mr. Durlach if we could acquire the property."

best, applicable to him, application of ambiguous portions of this lease and to convert those to a reason to terminate.

\* \* \*

And the law—finally, the law is pretty clear in South Carolina since the *Kiriakides* case came down, South Carolina has made a clear decision since 1994 to join the majority of states who do not—which do not permit a forfeiture of a leasehold interest for an immaterial breach of a commercial lease. The law is very clear now that—as it is in most states, that a breach must be material.

In some cases materiality is described just exactly as I described it a little while ago. The material expectation of a landlord in a lease agreement is to get his rent and to—you know, in many states in these cases that talk about this law, they cite the equitable principle. Since South Carolina now imposes an equitable obligation on the trier of the fact, they cite the equitable principle that the law abhors a forfeiture; equity does abhor a forfeiture. There's no question about that under the law.

There is a federal case law in the Fourth Circuit that says in the liberally related rule of contracts that the law abhors a forfeiture and that, quote, contractual provisions for forfeiture are looked upon with disfavor by the Courts, Galvin against Southern Hotels. It's an old principle, but it's new law in South Carolina that commercial leases are now imbued with principles of equity. This—it's relative—it's nine years old, but it's clearly the law . . .

And so we just ask you to do what you already know how to do, is to read a contract. You don't need me to tell you how to do that, but they can't always be read literally to the exclusion of all other concerns. They very seldom can. This one cannot. And we think that's what the landlord has done and we think it's for the sole purpose of getting us into a very vulnerable defensive position to renegotiate the contract, pure and simple. That's what we think it's about. And if we breached or we're in default, I believe it was immaterial, I submit it was immaterial, from immaterial matters, not going to the heart of the contract and not grounds for termination.

Although Respondents elected to emphasize the materiality of the breach, the record contains no support for Harris Teeter's contention that no evidence was presented as to the two disputed *Kiriakides* factors.

## B.

### Proximate Cause

■ Even if Harris Teeter had produced a scintilla of evidence that Respondents breached the standard of care by not fully presenting all of the *Kiriakides* factors to the arbitrator, Harris Teeter's claim would fail for lack of proximate cause. The claim fails for lack of proximate cause because, regardless of the source of the arbitrator's knowledge, he was fully aware of the *Kiriakides* decision. In his written ruling, the arbitrator cited and considered all *Kiriakides* factors. Of particular concern to Harris Teeter was the factor dealing with "the extent to which a party failing to perform will suffer forfeiture." The following excerpt from the arbitrator's decision lays to rest any suggestion that he failed to consider the consequences of lease forfeiture:

> While the *Arbitrator is ever mindful that termination and forfeiture of the Lease is a drastic remedy* and must be tempered by notions of equity and common sense, Harris Teeter's pattern of behavior and the resulting non-payment of sums owed under the Lease until the Lease was terminated justify EBV's actions. The numerous opportunities presented to Harris Teeter to timely address EBV's concerns and to cure its failure to pay sums due to Landlord under the Lease prior to termination (or to timely pay such sums in protest) simply cannot be ignored.

(Emphasis added).[7] Thus, any alleged failure by Respondents to present all *Kiriakides* factors was not the proximate cause of Harris Teeter's loss.

---

7. The parenthetical regarding the payment of the disputed expenses "in protest" lends Harris Teeter no support, for it was only after Harris Teeter retained Respondents that the expenses were paid to EBV. Respondents were retained in mid-January 2003. Payment of the disputed sums was made in mid-May 2003.

## C.

Harris Teeter relied on the deposition testimony of two experts, Levick and Charles Scarminach, to defeat summary judgment. Even if we were to accept Harris Teeter's argument that Levick and Scarminach were qualified to render an expert opinion, we agree with the trial court that their deposition testimony failed to present evidence of a breach of the standard of care or a genuine issue of material fact regarding proximate cause. Harris Teeter apparently recognized the clear insufficiency of the Scarminach and Levick testimony, for it submitted post-deposition affidavits in an attempt to rescue its malpractice claims. The trial court properly characterized these post-deposition affidavits as "sham" affidavits. *See Cothran v. Brown,* 357 S.C. 210, 218, 592 S.E.2d 629, 633 (2004) (setting forth six considerations a court may use to determine if a post-deposition affidavit is a "sham affidavit").

█ Scarminach concluded that the Respondents had breached the standard of care—despite failing to establish the standard of care in his deposition. The correct standard of care is "the degree of skill, care, knowledge, and judgment usually possessed and exercised by members of the profession." *Holy Loch Distribs.,* 340 S.C. at 26, 531 S.E.2d at 285. Scarminach, however, did not testify as to this standard. Instead, when asked about the definition of standard of care upon which he relied to form his opinion, Scarminach replied, "It's my standard." He later clarified by stating that his standard was that "of someone reading this at the end of the case," or "that of a businessman's lawyer." Neither of these additional statements accurately presents the proper standard of care. Thus, Scarminach's conclusory statement that Respondents breached the standard of care does not create a genuine issue of material fact.

█ Furthermore, Scarminach did not testify that the Respondents' action satisfied the causation in fact requirement of proximate cause. *Oliver v. S.C. Dep't of Highways & Pub. Transp.,* 309 S.C. 313, 316, 422 S.E.2d 128, 130 (1992) (stating that proximate cause requires proof of causation in fact and legal cause); *id.* (stating that causation in fact is proved by showing that plaintiff's injury would not have occurred "but for" defendant's negligence). When asked if the case would

have produced a different outcome had the Respondents not breached their standard of care, Scarminach hedged: "you never know because it's conjecture." Instead of stating that the Respondents' conduct most probably caused the outcome, Scarminach said, "had [Respondents] done these things, the percentage of success would have been greater." Thus, Scarminach's deposition did not establish that the Respondents' actions were the "but for" cause of Harris Teeter's loss.

■ Levick, on the other hand, testified the standard of care is a determination of what a "reasonably competent lawyer [would] do given the facts and situations they were handed." This generic statement is true in the abstract, as it can be applied to any professional negligence claim. Yet this circular opinion, when combined with Levick's deposition testimony, does not create a genuine issue of fact as to a breach of the standard of care. Levick's statement merely begs the question and adds nothing to the analysis of the substantive legal malpractice claim.

Levick's deposition testimony reveals the basis of this legal malpractice claim—a bad result. Levick was questioned concerning the basis of his opinion of Respondents' malpractice. Instead, Levick embarked on an unsolicited and unfounded attack against the arbitrator and his integrity. Levick stated that if the arbitrator were "fair, ... there is not a way in the world that [he] could have come up with this decision." Levick further stated, "I don't think [the arbitrator] had a clue" and "what [Respondents] didn't communicate was who they were dealing with as an arbitrator."

When asked if Harris Teeter would have "won ... before the arbitrator ... if the case had been handled in some different fashion[,]" Levick acknowledged, "Obviously, it's speculation." We agree. But Levick's "speculation" admission forms only part of our reasoning for concluding that his testimony is not sufficient to survive summary judgment. Like the excellent trial judge, we have carefully reviewed the entirety of Levick's testimony. Levick speaks only in generalities when he opines the case was not "properly presented." Levick's generalities fall woefully short of our admissibility standards for experts in professional negligence cases. Therefore, we agree with the trial court that neither expert

presented evidence to help Harris Teeter survive Respondents' motion for summary judgment.

## D.

■ Because Harris Teeter's malpractice claim seeks to establish the element of a breach of the standard of care through the arbitrator's adverse ruling, we address the relationship between a "bad result" and a professional malpractice claim. Harris Teeter lost in arbitration—and that bad result forms the core of Harris Teeter's malpractice allegation. Of course, any professional negligence claim involves a bad result. We reject as a matter of law any suggestion that a bad result is evidence of the breach of the standard of care. To do so would change the landscape of our malpractice law, for all professionals. We adhere to the principle that the exercise of a professional's judgment (and accompanying acts and omissions) must be considered at the time the professional service is rendered and not through the lens of hindsight.

In rejecting a hindsight analysis, the trial court found Respondents' actions were protected under the judgmental immunity rule, which has not been formally adopted in South Carolina. The judgmental immunity rule provides that "there can be no liability for acts and omissions by an attorney in the conduct of litigation which are based on an honest exercise of professional judgment." *Woodruff v. Tomlin,* 616 F.2d 924, 930 (6th Cir.1980). In referring to the judgmental immunity rule as "a sound rule," the *Woodruff* court observed that "[o]therwise every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight." *Id.* In assessing liability, a court should never measure a professional's performance through the lens of hindsight. Although an attorney may be liable for damages to a client for failure to act with a reasonable degree of skill and care, "[t]his does not mean, however, that an attorney acts as an insurer of the outcome of a case." *Crosby v. Jones,* 705 So.2d 1356, 1358 (Fla.1998).

Respondents made an informed judgment in their approach to the arbitration hearing. Respondents made a tactical and strategic decision to focus on whether Harris Teeter actually

breached the lease and the materiality of the alleged breach. Respondents, specifically Howell Morrison, made a tactical decision not to emphasize the precise value (in dollar terms) of the under-market lease because the attorneys believed this could work to Harris Teeter's detriment: "In my judgment it would not have helped the presentation of the case to emphasize the under market lease that Harris Teeter held ... and in my view then, and still in my view, if we had spent time showing the Arbitrator emphasizing that we had a submarket lease, it was very much a two-edged sword that could have easily worked to our detriment."

Morrison made a judgment call concerning the presentation of the *Kiriakides* factors—a judgment call that was not unreasonable as a matter of law. Because the judgment call was reasonable as a matter of law (and consequently no question of fact is presented), there is no viable claim of malpractice. Morrison's judgment call falls squarely in the category of a "professional judgment made with reasonable care and skill." *Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 666.

Although the judgmental immunity rule correctly highlights the rejection of a hindsight analysis, Respondents' entitlement to summary judgment does not depend on our adoption of the rule. We therefore leave the question of adoption of the judgmental immunity rule for another day.[8]

## E.

■ The practice of law is not an exact science. The practice of law involves the exercise of judgment based on the circumstances known and reasonably ascertainable at the time the judgment is rendered. "[A] lawyer shall exercise independent professional judgment and render candid advice." Rule 2.1, RPC, Rule 407, SCACR. The Rules of Professional Conduct are replete with the recognition that a lawyer cannot

---

**8.** Moreover, the judgmental immunity rule, if adopted, would serve merely as an adjunct at the summary judgment stage. The judgmental immunity rule would not shield an attorney from a malpractice claim when there is evidence of a failure to act with a reasonable degree of skill and care, which proximately causes damage, regardless of the attorney's good faith. Good faith, standing alone, is no defense to the objective-based malpractice standard. *See Ardis v. Sessions*, 383 S.C. 528, 682 S.E.2d 249 (2009).

pursue every issue that arises in a case while effectively representing his or her client. To the contrary, the Rules recognize that in order to provide a client the best and most competent representation, a lawyer has the professional discretion to make a judgment call as to which legal theories are the strongest and will best serve the client's interest. *See* Rule 1.3, cmt. 1, RPC, Rule 407, SCACR ("A lawyer is not bound, however, to press for every advantage that might be realized for a client. For example, a lawyer may have authority to exercise professional discretion in determining the means by which a matter should be pursued."); *Hudson v. Windholz*, 202 Ga.App. 882, 416 S.E.2d 120, 124 (1992) (recognizing that "the tactical decisions made during the course of litigation require, by their nature, that the attorney be given a great deal of discretion").

In retrospect, should Respondents have presented precise financial data to the arbitrator concerning the substantial boon of the under-market lease to Harris Teeter? Perhaps. But hindsight is not the measuring stick. A case can always be tried "better." Respondents made a considered judgment to focus on the merits of the alleged breach and particularly its materiality. As noted, that judgment call was not unreasonable as a matter of law. And as the arbitrator acknowledged, lease forfeiture was a "drastic remedy," as all understood that EBV wanted a new lease with market based rent and Harris Teeter wanted to preserve the 1979 lease.

Here, Respondents candidly warned Harris Teeter of the risk of lease termination, even to the point of Harris Teeter characterizing Respondents' legal candor as "wishey washey." Harris Teeter's flippant disregard of Respondents' candid warning mirrored its longstanding disregard of EBV's inquiries and requests to honor the lease. Harris Teeter went into arbitration with its eyes wide open regarding the risk. Respondents exercised independent and reasonable professional judgment in choosing what they deemed a proper strategy in representing Harris Teeter's interest before an arbitrator highly skilled and knowledgeable in commercial real estate matters. Because Respondents' judgment was not unreasonable as a matter of law, the trial court properly dismissed this malpractice claim.

## IV.

## CONCLUSION

We affirm the grant of summary judgment to Respondents.

**AFFIRMED.**

TOAL, C.J., BEATTY, J., and Acting Justice JAMES E. MOORE, concur. HEARN, J., concurring in part and dissenting in part in a separate opinion.

Justice HEARN:

Respectfully, I concur in part and dissent in part. I fully concur in the majority opinion to the extent that it affirms the circuit court's grant of summary judgment in favor of Respondents on the grounds they committed malpractice by failing to advise Harris Teeter of the risk of lease termination and by failing to settle the case before arbitration. However, I part company with the majority and would reverse the circuit court's grant of summary judgment as to Harris Teeter's allegations that Respondents committed malpractice by failing to introduce any evidence in regards to the two *Kiriakides* factors.

### I.

The single issue presented is whether Harris Teeter has presented sufficient evidence to survive summary judgment; I express no opinion as to what the outcome of this case would be after a trial on the merits. Faithful to my understanding of the principles governing review of an order granting summary judgment, as recently enunciated by this Court, my focus is only on whether Harris Teeter has presented a mere scintilla of evidence in support of its allegations of malpractice. *See Hancock v. Mid–S. Mgmt. Co.*, 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009) ("[I]n cases applying the preponderance of the evidence burden of proof, the non-moving party is only required to submit a mere scintilla of evidence in order to withstand a motion for summary judgment."). This standard requires merely "the slightest amount of relevant evidence" on an issue to warrant denial of summary judgment. *Black's Law Dictionary* 635 (3d pocket ed.2006). If this indeed is the

standard, it must be applied in every case, including attorney malpractice cases.

As the majority correctly recognizes, *Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 440 S.E.2d 364 (1994), is the controlling case in South Carolina to determine whether a tenant materially breached the terms of his lease agreement with a landlord so as to justify termination of the lease. In *Kiriakides,* we held, "a lease may not be forfeited for a trivial or technical breach even when the parties have specifically agreed that 'any breach' gives rise to the right of termination." 312 S.C. at 275, 440 S.E.2d at 366. Instead, we stated, "to justify forfeiture, the breach must be material, serious, or substantial." *Id.* In order to determine whether the breach was material, we announced the following five factor test:

 (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

 (b) the extent to which the injured party can be adequately compensated [by damages] for the part of that benefit of which he will be deprived;

 (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

 (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

 (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* at 275–76, 440 S.E.2d at 366–67 (citing Restatement (Second) of Contracts § 241 (1981)).

A. *Standard of Care*

During Levick's deposition, he testified that Respondents breached their standard of care by failing to introduce any evidence during the arbitration in regards to the two *Kiriakides* factors.[9] In his deposition, Levick was asked, "[w]as it

9. I agree with the majority's determination that Scarminach failed to establish the appropriate standard of care and satisfy the "most proba-

incompetent to fail to put in the monetary value of the lease to Harris Teeter?" Levick responded "yes." Additionally, Levick testified that Respondents' failure to introduce any evidence during the arbitration concerning the value of Harris Teeter's current lease—as Levick stated, "not just to Harris Teeter, but the value to the landlord when he bought it"—was a "key issue." At another point in his deposition, Levick was asked, "[g]iven the first *Kiriakides* factor is the extent to which a party will be deprived o[f] [the] benefit[ ] reasonably expected, was it incompetent to fail to specifically argue that factor was met because Harris Teeter always paid their rent?" Again, Levick responded "yes." Moreover, the following colloquy occurred during Levick's deposition:

Q: Let's go down to [subpart] D [of Harris Teeter's complaint against Respondents], failing to adequately prepare for the arbitration. Tell me specifically what was not done that you think in your judgment should have done to prepare?

A: I would have had a tremendous amount of evidence on the value of the lease to Harris Teeter. I would have had a whole economic evaluation of why the purchase price that was paid at the time that Durlach bought it, why that price was fair and reasonable given the lease and what a windfall the termination would produce. I would have an appraiser's analysis show the value of the property if the Harris [Teeter] lease wasn't in place. . . . And I don't recall that any of that—well, I didn't see that any of that was presented. In fact, I did see that there was a conscious decision to not show the value of the lease to Harris Teeter. . . . There was no evidence submitted on any of this I can find.

bly" requirement to prove proximate cause. Accordingly, his testimony and post-deposition affidavit are irrelevant to the determination of whether Harris Teeter has set forth sufficient evidence to survive summary judgment. I disagree, however, with the conclusion that Levick's post-deposition affidavit is a sham because this later affidavit did not contradict the position he took at his deposition. *See Cothran v. Brown,* 357 S.C. 210, 218, 592 S.E.2d 629, 633 (2004) (stating under the sham affidavit rule, a court may disregard a subsequent affidavit as a sham—as not creating an issue of fact for purposes of summary judgment—if the subsequent affidavit contradicts a party's own prior sworn statement).

The majority disregards Levick's testimony and concludes "Respondents presented *Kiriakides* front and center to the arbitrator." This finding is in direct conflict with the testimony of Howell Morrison, the attorney representing Harris Teeter at arbitration. During his deposition, Morrison acknowledged he did not introduce any evidence in regards to the *Kiriakides* factors at issue. In fact, Morrison testified that he made a conscious decision not to introduce such evidence. The relevant portions of Morrison's testimony are quoted below.

> Q: Did you ever look at the effect of that long term lease that was under market [value] on the price that Mr. [D]urlach paid for the building?
>
> A: I knew that it had a depressive market impact on the market value for most buyers. I assumed so. It was common sense and obvious to me.
>
> Q: Did you get any evidence on that? I don't see any evidence in the record about that.
>
> A: No. I didn't see that as any primary issue in the Arbitration.
>
> . . . .
>
> Q: The first criteria [sic] of the *Kiriakides* [case] is the extent to which the injured party will be deprived of the benefit which he reasonably expected. If you buy a building under value, depressed because of the lease, you're expecting to get the lease that's on the building—the lease payments aren't you?
>
> A: If you buy below market value or above market value or at market value, you expect to get your lease. Right.
>
> . . . .
>
> Q: I don't see anything in the record to show how much money Mr. Durlach was going to [make in] windfall, not only in lease payments, but in the value to his property by getting this lease out. And that was crucial to this case. Why wouldn't you have [done] that?
>
> A: It was not crucial. In my judgment it would not have helped the presentation of the case to emphasize the under market lease that Harris Teeter held.
>
> . . . .

Q: Is there any evidence in the record that would show what the value would—how the fair market value of the building would appreciate or what rent he might get?

A: I did not specifically introduce evidence of that type.... And in my view then, and still in my view, if we had spent time showing the Arbitrator emphasizing that we had a submarket lease, it was very much a two-edged sword that could have easily worked to our detriment.

. . . .

Q: Did you put in one dollar figure at what it would cost Harris Teeter?

A: I don't think [so]. I made a decision not to do that.

Q: ... And did you have in the record, one dollar figure at how this would impact Mr. Durlach in getting more money than he would have expected when he bought the property?

A: Well, what if he expected to find a way to renegotiate the lease, number one?

Q: Did you show him [the arbitrator] how much money he would make by doing that?

A: No. I did not express total dollar figure either way.

The majority relies exclusively on Respondents' pre-hearing memorandum and comments made by Respondents during opening and closing arguments to support its conclusion that Respondents fully presented *Kiriakides* to the arbitrator.[10] As demonstrated by the testimony set forth above, Morrison unequivocally conceded that he did not introduce any evidence pertaining to the two *Kiriakides* factors in question to the arbitrator. Moreover, the statements relied on by the majority—the pre-hearing memorandum and opening and closing remarks—are merely arguments of counsel and have long been recognized by this Court not to constitute evidence. *See, e.g., Ex parte Morris*, 367 S.C. 56, 64, 624 S.E.2d 649, 653 (2006).

---

10. I note even in the pre-hearing memorandum and in opening and closing statements, Respondents merely mentioned *Kiriakides* by name, listed the five factor test, and generally stated the factors weighed in Harris Teeter's favor. Respondents never produced any evidence demonstrating how these two *Kiriakides* factors applied to the facts of this case.

B. *Proximate Cause*

In order to demonstrate proximate cause, a plaintiff must show he most probably would have been successful in the underlying suit if the attorney had not committed the alleged malpractice. *Summer v. Carpenter,* 328 S.C. 36, 42, 492 S.E.2d 55, 58 (1997). This Court in *Baughman v. American Telephone & Telegraph Co.* succinctly stated the "most probably" rule as follows:

> It is not sufficient for the expert ... to testify merely that the ailment might or could have resulted from the alleged cause. He must go further and testify that taking into consideration all the data it is his professional opinion that the result in question most probably came from the cause alleged.

306 S.C. 101, 111, 410 S.E.2d 537, 543 (1991). But, "[i]n determining whether particular evidence meets this test it is not necessary that the expert actually use the words 'most probably.'" *Id.*

To survive summary judgment, the evidence presented must amount to more than mere speculation and conjecture. *McKnight v. S.C. Dep't of Corrs.,* 385 S.C. 380, 390, 684 S.E.2d 566, 571 (Ct.App.2009). The expert must therefore state this opinion with reasonable certainty. *See Ellis v. Oliver,* 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996). However, in evaluating a motion for summary judgment, we must not weigh the credibility of the witnesses and the testimony. *Anderson v. The Augusta Chronicle,* 355 S.C. 461, 475, 585 S.E.2d 506, 513 (Ct.App.2003). Thus, if the expert's testimony facially meets these criteria, it will be sufficient to defeat summary judgment.

During his deposition, Levick testified as follows:

> My opinion is had they gone step by step through the *Kiriakides* case, had they shown the extreme windfall for the landlord and the extreme detriment to the tenant, had they shown the communications between the parties in great depth orally, had they shown the intent of the original parties in its entirety, had they shown what the law is in other jurisdictions, had they shown custom and usage ... there is not a way in the world that they could have come up

with this decision. That is my opinion. It could not have happened.

Then, in another point in his deposition, the following colloquy occurred:

Q: Is it your overall opinion that if this case before the arbitrator had been handled in some different fashion, more specifically in the way that you suggest, the case would have been won by Harris Teeter before this arbitrator?

A: Obviously it's speculation, but in reading the opinion, the only thing that I can gather is that the arbitrator believed that Harris Teeter's conduct was so egregious that terminating a very valuable lease was a remedy. I don't think that the arbitrator had an inkling in assuming he was the fair person that they thought they were hiring, had an inkling that this was a landlord who Harris Teeter's lawyer believed was trying to set them up for a lease termination, that basically was trying to get out of this lease and was using the arbitrator as a way to do it. I don't think he had a clue, and I don't think he would have permitted himself to be used as a vehicle for terminating a perfectly valid lease that had been in force for 21 years when the guy bought it; that he bent backwards and forwards over it; that he requested no changes when he bought it; that this all of a sudden would translate into egregious bad faith that would deprive HT [sic] of the benefit of a lease that they had honored for 21 years. *I just don't see him coming to that decision if the case was presented properly.*

(emphasis added).

Levick's first statement clearly satisfies the most probably requirement. As a result, I would hold that Harris Teeter has presented sufficient evidence to survive summary judgment with respect to its allegation that Respondents committed malpractice by failing to introduce any evidence in regards to the two *Kiriakides* factors.

Admittedly, Levick's second statement is more problematic because he began by stating, "[o]bviously it's speculation." In the circuit court's view, Levick's introductory statement rendered his entire opinion on the issue of proximate cause as nothing more than mere conjecture or speculation. I disagree with this interpretation of the statement. In reading Levick's

second statement in context, I would find he did not state his conclusion—whether the result of the proceeding most probably would have been different-was speculation.[11] *See Brockbank v. Best Capital Corp.,* 341 S.C. 372, 378–79, 534 S.E.2d 688, 692 (2000) ("In determining whether any triable issues of fact exist, the court must view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the non-moving party."). Rather, in answering the question, Levick began by speculating as to *why* the arbitrator reached the conclusion he reached. In doing so, he initially stated that such telepathy is "[o]bviously ... speculation." In explaining why be believed the arbitrator terminated the lease, Levick surmised that the arbitrator inexplicably and erroneously viewed Harris Teeter as the bad actor in this case when in reality the landlord was the bad actor. This hypothesizing ended, however, when at the end of his answer Levick unequivocally stated, "I just don't see him coming to that decision if the case was presented properly."

In *Baughman,* this Court stated expert testimony is sufficient to establish proximate cause so long as the testimony is such "as to judicially impress" that the opinion represents the expert's professional judgment as to the most likely among possible outcomes. 306 S.C. at 111, 410 S.E.2d at 543 (internal quotation omitted). Mindful of *Baughman* and our standard of review, I would find Levick testified that the result of the proceeding most probably would have been different if Respondents had not breached their duty of care to Harris Teeter.[12]

---

11. Even if I were to agree with the circuit court and the majority that Levick failed to satisfy the most probably requirement in his second statement, Harris Teeter has still presented sufficient evidence to overcome Respondents' motion for summary judgment by virtue of Levick's first statement.

12. The majority holds that Harris Teeter's claim fails for lack of proximate cause because the arbitrator, in his ruling, did cite and discuss all the *Kiriakides* factors. In response, Harris Teeter offered the testimony of Levick, as discussed above. These two competing viewpoints—that the arbitrator fully considered *Kiriakides* and that he most probably would have reached a different conclusion had the Respondents fully presented *Kiriakides* to him—are the *sine qua non* of denying summary judgment: a genuine issue of material fact.

Based on our analysis, I would conclude that Levick's deposition established the standard of care for attorneys; Respondents breached that standard of care by failing to introduce any evidence in regards to the two *Kiriakides* factors; and finally, that the result of the proceeding most probably would have been different had Respondents not breached their duty of care to Harris Teeter.

### C. *Judgmental Immunity Rule*

I concur in the majority's decision to not adopt the judgmental immunity rule at this time. Under the judgmental immunity rule, strategic decisions made by an attorney in good faith and in conformity with the standard of care cannot be the basis of a legal malpractice claim. *Biomet Inc. v. Finnegan Henderson LLP,* 967 A.2d 662, 666 (D.C.2009). If Respondents did not breach their standard of care as a matter of law, then an additional rule insulating them from liability is unnecessary. While I agree that we should not adopt this rule under the facts before us, it would be my view that we should never adopt it.

The core of this rule is nothing more than a tautology; it has always been clear that so long as an attorney exercises a reasonable degree of skill and care he will not suffer liability. Adopting a separate rule that restates that cardinal principle of our malpractice jurisprudence and denominates it an "immunity" certainly is *de trop. See Sun Valley Potatoes, Inc. v. Rosholt, Robertson & Tucker,* 133 Idaho 1, 5, 981 P.2d 236 (1999) ("Rather than being a rule which grants some type of 'immunity' to attorneys, it appears to be nothing more than a recognition that if an attorney's actions could under no circumstances be held to be negligent, then a court may rule as a matter of law that there is no liability."). Indeed, if this rule is in fact different from our general rules concerning attorney malpractice, then it would inherently sanction some conduct that would otherwise be negligent. To the extent the judgmental immunity rule restates the general rule that attorneys must comply with the standard of care, I would not adopt it as it is superfluous; to the extent that it offers any more protection to attorneys, I cannot join in the sanctioning of unprofessional and negligent conduct under the guise of "good faith" and "professional judgment."

## II.

Every malpractice case is, by its very nature, "Monday morning quarter-backing," and I wholeheartedly agree with the majority's statement that "[t]he practice of law is not an exact science." I also agree we grant attorneys a wide degree of discretion in how they prepare and try their cases. Indeed, clients are compensating attorneys for that very exercise of discretion. However, the issue of whether Respondents committed legal malpractice is not before the Court; that question must wait for another day. Rather, today we are called upon to determine solely whether Harris Teeter has met its burden in opposing summary judgment. I would hold that Harris Teeter adduced at least a mere scintilla of evidence sufficient to survive summary judgment. I want to reiterate that in so doing, I pass no judgment on the merits of either side of this case or Levick's credibility. Rather, I would faithfully adhere to the principles established by this Court as to the role we play on review of summary judgment orders. Accordingly, I would reverse and remand for a trial on the merits of Harris Teeter's claim regarding the two *Kiriakides* factors.